[No. 60392-8. En Banc. November 22, 1994.]

TIMBERLINE AIR SERVICE, INC., ET AL, *Appellants*, v.
BELL HELICOPTER-TEXTRON, INC., *Respondent.*

306

*Northcraft, Tierney & Hilleman, P.C.,* by *Mark S. North-craft,* for appellants.

*Mills Cogan Meyers Swartling,* by *Blair B. Burroughs* and *Frederick M. Meyers,* for respondent.

BRACHTENBACH, J. — At issue is whether a manufacturer who complies with mandatory government specifications for design of a military helicopter later converted to civilian use has an absolute defense to a postmanufacture products liability failure-to-warn claim under either RCW 7.72.050(2) or the federal common law government contractor's defense. We conclude neither the statute nor the common law defense applies, and accordingly reverse the trial court's grant of summary judgment in favor of the manufacturer.

For purposes of this appeal, the manufacturer, Respondent Bell Helicopter-Textron, Inc. (Bell), concedes the accuracy of the facts as stated by Appellants Timberline Air Service, Inc., and James and Adele Crawford (hereafter collectively Timberline).

This case began as a collection action on an open account against Timberline. Timberline filed a third party complaint asserting several product liability claims against Bell. These product liability claims arose from a helicopter crash on June 14, 1989, during logging operations. The UH-1L helicopter which crashed was manufactured by Bell in 1969 pursuant to a government wartime procurement contract, and was one of over 10,000 Huey series helicopters developed and manufactured by Bell beginning in the mid-1950's and sold to the government. The military owned the helicopter for nearly 17 years, then it was transferred in 1986 to an Oregon corporation which sold it to Timberline. The helicopter was certified by the Federal Aviation Administration (FAA) in 1986 for use in civilian restricted category operations, including logging. It was one of several hundred former military helicopters which had been surplused by the military and then used in civilian operations with certification by the FAA.

The crash resulted from the failure of the -9 input pinion gear installed in the helicopter's 42-degree gearbox. In brief, this gearbox is one of two through which power is transmitted to the tail rotor. The tail rotor is used by the pilot to counteract the spinning effect on the helicopter caused by

the circular motion of the main rotor. With failure of the -9 gear, power is no longer transmitted to the tail rotor. Timberline alleges that the crash resulted when James Crawford, who piloted the aircraft, could not control the helicopter's spin after failure of the 42-degree gearbox -9 input pinion gear.

Civilian equivalents of the helicopter were also sold, and these commercial counterparts are capable of and are used in external lift operations, including repetitive heavy lift operations. The UH-1L helicopter has the same external cargo capabilities as the commercial counterparts. The -9 gear is interchangeable among commercial and military versions of the Huey helicopters, and is still available from Bell as a replacement part for both civilian and former military helicopters.

As early as 1977, Bell learned of adverse effects of repetitive heavy lift operations upon component parts of the commercial and military helicopters which it had manufactured. Beginning in 1981, Bell warned operators of the civilian equivalent Huey series helicopters that certain component parts are adversely affected by repetitive heavy lift operations, but did not warn owners and operators of former military helicopters. Bell did notify the FAA, which issued airworthiness directives addressing the problem and affected parts.

However, unlike the case with other component parts, with respect to the -9 input pinion gear Bell never issued warnings to owners and operators of either commercial or former military helicopters of the effect of repetitive heavy lift operations on the gear and the 42-degree gearbox. Prior to the helicopter crash at issue here, four 42-degree gearbox failures had occurred involving former military Huey series helicopters, and one had occurred in a commercial helicopter of the Huey series. Up to the time of preparing its brief, Timberline claims that eight and possibly nine -9 gear failures have occurred. In 1989, after four of these failures (involving one death and one serious injury), Bell wrote to the FAA about the effect of repetitive heavy lift operations

on the 42-degree gearboxes incorporated in former military helicopters used in civilian heavy lift operations, identifying four accidents, the first occurring in 1982.

There is no dispute on appeal that the design of the helicopter, including the 42-degree gearbox and the -9 gear, is in compliance with mandatory government design specifications.

In September 1992, Bell filed a Motion for Partial Summary Judgment seeking dismissal of Timberline's claims based upon design defects and failure to warn of design defects. Bell argued that the federal common law government contractor defense provides a complete defense. The trial court granted the motion in part, dismissing all claims except a claim that Bell failed to provide postmanufacture warnings of a danger connected with the product but not learned of until after manufacture. Bell filed a Supplemental Motion for Partial Summary Judgment, and on April 1, 1993, the trial court granted the motion and dismissed the postmanufacture failure-to-warn claim on the basis of the government contractor's defense. Timberline appealed. Direct review was granted.

RCW 7.72.030(1)(c) provides for liability for violation of the postmanufacture duty to warn:

> (1) A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided.
>
> . . . .
>
> (c) A product is not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured where a manufacturer learned or where a reasonably prudent manufacturer should have learned about a danger connected with the product after it was manufactured. In such a case, the manufacturer is under a duty to act with regard to issuing warnings or instructions concerning the danger in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances. This duty is satisfied if the manufacturer exercises reasonable care to inform product users.

Timberline maintains the -9 gear cannot withstand the frequency of application or maximum power during repeti-

tive heavy lift operations, and that Bell knew or should have known of the dangerous nature of the gear after it was designed and originally manufactured, long before the crash of Timberline's helicopter, but that Bell failed to warn of the danger. Timberline says it can prove that Bell could have issued proper warnings to civilian operators of aircraft which utilize the -9 gear (there is no question that the owners and operators of former military helicopters are readily ascertainable). Timberline suggests several courses which Bell could have followed, including reducing the suggested times between overhauls, suggesting alternative means of determining flight hours based upon repetitive lift usage, and prescribing a finite life for the -9 gear. As noted, Bell concedes the accuracy of these factual assertions for purposes of this appeal.

■ In that there are no disputed facts on this appeal from summary judgment, the issues are issues of law which this court reviews de novo. *Rivett v. Tacoma*, 123 Wn.2d 573, 578, 870 P.2d 299 (1994).

## STATUTORY DEFENSE

RCW 7.72.050(2) sets forth Washington State's statutory government contractor's defense to a product liability claim. Pursuant to the statute:

> When the injury-causing aspect of the product was, at the time of manufacture, in compliance with a specific mandatory government contract specification relating to design or warnings, this compliance shall be an absolute defense.

RCW 7.72.050(2).

There is no dispute on appeal that Bell complied with specific mandatory government contract specifications for design of the product. The initial question is whether Bell's compliance with specifications pertaining to design gives rise, as a matter of law, to an absolute statutory defense to a postmanufacture *failure-to-warn* claim. In deciding this question, we first examine RCW 7.72.050(2) and determine whether, if there was compliance with design specifications, any and all product liability claims are foreclosed. We then

turn to Bell's suggestion that the statute does not, by its terms, address postmanufacture warnings, and therefore the statutory defense must be read as an exception to the postmanufacture duty to warn. Lastly, we address Bell's argument that Timberline's claim is, in actuality, a design defect claim.

■ Our first inquiry is the meaning to be given the language in RCW 7.72.050(2). The purpose of statutory construction is to effectuate legislative intent. *Washington Fed'n of State Employees, Coun. 28 v. Office of Fin. Mgt.*, 121 Wn.2d 152, 163, 849 P.2d 1201 (1993); *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 185, 829 P.2d 1061 (1992). "Where the meaning of the statute is clear from the language of the statute alone, there is no room for judicial interpretation." (Footnote omitted.) *Kadoranian, at 185.*

■ ■ However, where a statute is susceptible to more than one meaning, it is ambiguous. *Shoreline Comm'ty College Dist. 7 v. Employment Sec. Dep't*, 120 Wn.2d 394, 405, 842 P.2d 938 (1992). If statutory language is ambiguous, resort to aids to construction, including legislative history, is appropriate. *Kadoranian, at 185.*

Here, the statute provides that when the "injury-causing aspect" of the product was "in compliance with" a "specification relating to design or warnings", that compliance is an absolute defense. RCW 7.72.050(2). Bell argues that "[c]ompliance with mandatory specifications relating either to design or to warnings is a sufficient condition to the availability of the absolute defense to product liability" because the statute refers to compliance with specifications relating to design *or* warnings. Br. of Resp't, at 20. Thus, according to Bell, compliance with design specifications precludes any product liability claim. This is a possible reading of the statute, though not a likely one, as explained below.

The statute is amenable to another interpretation, *i.e.*, that if the injury is alleged to result from a design defect, the defective design aspect must have been in compliance with a specific mandatory government contract specification

relating to design. Similarly, if the injury allegedly results from a failure to warn, the statutory defense arises if warnings of the danger were given in compliance with a specific mandatory government contract specification. That is, the statute requires a link between the particular design defect or the failure to warn alleged to have caused the injury, and a specific mandatory contract specification. Thus, for example, where there are contract specifications relating to warnings, but not to design, a *design* aspect causing injury would not be *"in compliance with"* any contract specifications relating to *design*, and the defense would not arise.

The statute is susceptible to more than one meaning and is thus ambiguous.[1] Several principles of statutory construction, as well as legislative history, indicate that while compliance with design specifications may give rise to the absolute statutory defense to a design defect claim, it does not give rise to the absolute defense in RCW 7.72.050(2) to any other product liability claim.

When the same words are used in different parts of the same statute, it is presumed that the Legislature intended that the words have the same meaning. *State v. Hutsell,* 120 Wn.2d 913, 920, 845 P.2d 1325 (1993); *cf. Cowles Pub'g Co. v. State Patrol,* 109 Wn.2d 712, 722, 748 P.2d 597 (1988) (similar words used in different parts of the same statute presumed to have same meaning throughout). The second sentence of RCW 7.72.050(2) provides:

> When the injury-causing aspect of the product was not, at the time of manufacture, in compliance with a specific mandatory government specification relating to design or warnings, the product shall be deemed not reasonably safe under RCW 7.72.030(1).

---

[1]Bell maintains the statute is not ambiguous, citing *In re Estate of Foster,* 55 Wn. App. 545, 551, 779 P.2d 272 (1989), *review denied,* 114 Wn.2d 1004 (1990). The court there said there was no ambiguity in the language "specific mandatory government contract specification", in the face of an argument that this language is ambiguous and legislative history supports the view that if the government consults with the manufacturer about the specification, the defense does not arise. The court did not address other language in the statute which is crucial in this case, *i.e.,* "injury-causing aspect" "in compliance with" a specification "relating to design or warnings". *In re Estate of Foster, supra,* does not support a conclusion that this other language is unambiguous.

The meaning given the same language in the first sentence of the provision should accord with that given this language in the second sentence.

■ Another principle of statutory construction is that we assume that the Legislature does not intend to create an inconsistency in a statute, and thus we seek to avoid interpreting a statute in a way which leads to inconsistency. *Lutheran Day Care v. Snohomish Cy.*, 119 Wn.2d 91, 103, 829 P.2d 746 (1992), *cert. denied*, 122 L. Ed. 2d 353 (1993); *see Washington Physicians Serv. v. Marquardt*, 67 Wn. App. 650, 655, 838 P.2d 142 (1992).

If we accept Bell's construction of the statute, and if we give the same language in the two separate sentences of RCW 7.72.050(2) the same meaning, an inconsistency results. Bell says that under the first sentence of the provision, compliance with either design specifications or warnings specifications gives rise to the defense. Under the second sentence, interpreting the language in the same way would mean that noncompliance with either design specifications or warnings specifications would require the conclusion that the product is not reasonably safe whether the claim is a design defect claim or a failure-to-warn claim. If a government contract contains specific mandatory specifications for both design and warnings, and a manufacturer complies with one type of specifications but not the other, then, under Bell's urged construction, the absolute defense would arise under the first sentence of the provision, but under the second sentence the product would be deemed not reasonably safe — clearly an inconsistency.

■ Additional rules of statutory construction provide that provisions in a statute are read in the context of the statute as a whole, *Pope v. UW*, 121 Wn.2d 479, 489, 852 P.2d 1055, 871 P.2d 590 (1993), *cert. denied*, 127 L. Ed. 2d 381 (1994); that "[a]ll the provisions of an act must be considered in their relation to each other and, if possible, harmoniously construed to insure proper construction of each provision", *Publishers Forest Prods. Co. v. State*, 81 Wn.2d 814, 816, 505

P.2d 453 (1973); and that "[s]tatutory provisions are construed in light of one another and in view of the statute's overall purpose[,]" *Nelson v. National Fund Raising Consultants, Inc.,* 120 Wn.2d 382, 392, 842 P.2d 473 (1992).

The second sentence of RCW 7.72.050(2) specifically refers to RCW 7.72.030(1), which describes different theories of manufacturer liability in products liability actions. By referring to design *or* warnings and to RCW 7.72.030(1), which sets forth the types of claims, RCW 7.72.050(2) recognizes that distinct claims may arise depending upon the way in which the product is alleged to be dangerous. Reading RCW 7.72.050(2) in light of the rest of the act leads to the conclusion that there may be a design claim, where compliance with design specifications is relevant, or a failure-to-warn claim, where compliance with specifications relating to warnings may be relevant.

Legislative history supports this view of the statute. The Model Uniform Product Liability Act (UPLA), 44 Fed. Reg. 62,714-62,750 (1979), promulgated by the United States Department of Commerce, served as the basis for the Washington tort reform act of 1981. Senate Journal, 47th Legislature (1981), at 624. The 1981 tort reform act, as it was first proposed in the 1981 Legislature, did not contain what is now RCW 7.72.050(2). However, this part of the statute parallels a UPLA provision, and was added to the act as an amendment proposed by the judiciary committee. Senate Journal, 47th Legislature (1981), at 613. The UPLA counterpart provides:

> When the injury-causing aspect of the product was, at the time of manufacture, in compliance with a mandatory government contract specification relating to design, this shall be an absolute defense and the product shall be deemed not defective under Subsection 104(B) [product unreasonably unsafe in design], or, if the specification related to warnings or instructions, under Subsection 104(C) [product unreasonably unsafe because adequate warnings or instructions not provided] or 105(A) [product sellers].

UPLA § 108(C), 44 Fed. Reg. at 62,730.

Like the UPLA provision, the state statute refers to design *or* warnings, and further refers to the other provisions in the act which set forth separate and distinct product liability claims. Unlike the UPLA provision, the state statute does not separately refer to compliance with design specifications as being a defense to design defect claims and compliance with instruction or warning specifications as being a defense to a failure-to-warn claim. However, the state statute corresponds to the UPLA provision, and does not suggest any departure from the UPLA standard.

The analysis to the UPLA counterpart is revealing:

> Subsection (C) addresses a highly specialized problem with respect to a product that had been manufactured strictly in accordance with mandatory specifications set forth in a government contract. *When compliance with such a standard leads to an injury*, the government, not the product seller, is the appropriate defendant. As the court in "Hunt v. Blasius," 55 Ill. App. 3d 14, 370 N.E. 2d 617, 621-22 (1977) [aff'd, 74 Ill. 2d 203, 384 N.E.2d 368 (1978)], indicated, "public policy dictates that bidders who comply strictly with governmental specifications should be shielded from liability *in any respect in which the product complies.*"

(Italics ours.) UPLA § 108(C) analysis, 44 Fed. Reg. at 62,731. These comments demonstrate that there must be a causal link between the injury and the compliance with the standards set forth in the government contract specification before the defense arises. That being so, compliance with design specifications does not give rise to the defense where the claim is a legitimate claim that the injury resulted from failure to warn and not from a design defect.

██ As noted, the goal of statutory construction is to effectuate legislative intent. Clearly the statute is not intended to grant broad immunity to government contractors — only if specific criteria are satisfied does the defense arise. The evident legislative purpose is to protect the government contractor from liability resulting from compliance with specific mandatory specifications. Put another way, the statute provides protection where the government contractor is required to design a product in a certain way or to provide certain warnings, and the compliance with those specifica-

tions would otherwise expose the contractor to a product liability claim.

The Court of Appeals reached the same conclusion in *Hoglund v. Raymark Indus., Inc.*, 50 Wn. App. 360, 369, 749 P.2d 164 (1987), *review denied*, 110 Wn.2d 1008 (1988). In *Hoglund*, a worker who contracted asbestosis from working on naval vessels asserted a failure to warn claim against the manufacturer of products which government specifications required contain asbestos. The trial court had rejected a manufacturer's proposed jury instruction based upon RCW 7.72.050(2). The Court of Appeals held there was no error. The court said the purpose of the statute is to preclude manufacturer liability where the manufacturer complies with "governmental standards when it is later found that *those standards* would have, if followed, *produced* an unsafe product." (Italics ours.) *Hoglund*, at 369. The court reasoned that although the government required the asbestos products to meet certain requirements, the governmental standards did not prevent the manufacturer from fulfilling its duty to warn of dangers posed by exposure to the products, and thus RCW 7.72.050(2) did not excuse the manufacturer from liability for failure to warn. *Hoglund*, at 369-70.

 Another principle of statutory construction is that a statute should be construed so as to avoid unlikely, absurd, or strained consequences. *Ski Acres, Inc. v. Kittitas Cy.*, 118 Wn.2d 852, 857, 827 P.2d 1000 (1992). Imagine, for example, that the government buys a stock item, such as a space heater, from a manufacturer, and requires, by a specific mandatory contract specification, that there be warnings to the effect that flammable materials should not be stored within "x" feet of the heater. There are no contract specifications, however, pertaining to design. Imagine that the space heater suffers from a serious design defect which causes it to fail to shut off when the desired temperature is reached, and devastating fires result from the heater's overheating. In this example, compliance with the warnings specification

bears no relationship to the injury-causing aspect of the heater, a defective design allowing it to overheat.

Alternatively, imagine that the government contract specifications require that the heater meet design specifications for an automatic shutoff once a certain temperature is reached, but there are no specifications for warnings. Imagine that flammable materials are stored too close to the heater, and a fire results. The government contractor's compliance with the design specifications bears no relationship to the injury-causing aspect of the heater, *i.e.*, the failure to warn of the danger existing when flammable materials are stored too close.

Construing RCW 7.72.050(2) to provide an absolute defense to any and all products liability claims under either circumstance described above leads to unlikely, strained, and even absurd results — precluding products liability claims even though absolutely nothing mandated by the government prevents the manufacturer from designing a safe product in the first example or giving adequate warnings in the second example, and regardless of how serious and harmful the manufacturer's failure to design a safe product or adequately warn of dangers is.

We hold that compliance with specific mandatory government contract specifications relating to design does not give rise to the absolute defense in RCW 7.72.050(2) to a postmanufacture failure-to-warn claim.

We note that our construction of RCW 7.72.050(2) accords with WPI 110.05, which sets forth alternative jury instructions depending upon whether the injury-causing aspect is alleged to be in conflict with government specifications relating to design or is alleged to be in conflict with government specifications relating to warnings.

Bell also reasons that the defense in RCW 7.72.050(2) is an exception to the postmanufacture duty to warn. Bell points out that Timberline argues that because there were no warnings specifications, Bell could not have complied with any such specifications, and therefore the statutory defense does not arise. Bell says that this argument is

flawed because RCW 7.72.050(2) speaks of compliance with specifications "at the time of manufacture", while a post-manufacture duty to warn would necessarily arise only after manufacture. Bell maintains there could thus never be compliance with postmanufacture warnings specifications, and maintains the only way to harmonize the two statutes is to read the statutory defense as an exception to the post-manufacture duty to warn.

We disagree. As discussed, the purpose of the statute is to protect a manufacturer from liability arising from its compliance with specific mandatory government contract specifications. The focus is thus on what the injury-causing aspect of the product is, whether there were mandatory contract specifications leaving the manufacturer no choice but to comply, and whether the injury-causing aspect of the product was in fact in compliance with those specifications. There is no question here that the only compliance was with design specifications. Compliance with design specifications may bar a design defect claim under RCW 7.72.050(2), but it does not bar other claims, including a postmanufacture failure-to-warn claim.

Bell also maintains, however, that the injury-causing aspect of the helicopter is a design defect in the -9 input pinion gear, which was manufactured in compliance with specific mandatory government contract specifications. Then, Bell reasons, because this is actually a design defect case, and Bell complied with design specifications, it is entitled to the statutory defense.

We disagree. Timberline claims that the cause of the failure of the -9 gear was "the more numerous incidences of stress imposed upon the -9 gear during repetitive heavy lift operations than foreseen by Bell at the time of its original design and manufacture". Br. of Appellant, at 14. Timberline says that the -9 gear is not defective for the use for which it was originally designed for the government, Br. of Appellant, at 18. Under Timberline's theory of liability, the "injury-causing aspect" of the product was not faulty design, but the failure to warn of a danger of which Bell learned after

manufacture, *i.e.*, that repetitive heavy lift operations could stress the -9 gear and cause it to fail.

Like RCW 7.72.050(2), which references design and warnings "at the time of manufacture", RCW 7.72.030(1)(a) and (b) refer to design defects "at the time of manufacture" and failure to warn of dangers about which the manufacturer knows "at the time of manufacture". RCW 7.72.030(1)(c), however, which sets forth the postmanufacture duty to warn, refers to a failure to warn of a danger of which the manufacturer learns after manufacture, the type of claim which Timberline makes here. Timberline's claim is not a design defect claim.

### COMMON LAW DEFENSE

In 1988, the United States Supreme Court held that, as a matter of federal common law, under certain circumstances liability under state tort law for injury or death caused by products could not be imposed on those supplying the products to the government under contracts with the United States. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988). Prior to *Boyle*, the government contract defense had been recognized, but *Boyle* defined the defense in terms of a type of federal preemption, identified the underpinnings of the defense, and set forth requirements for displacement of state law.

In *Boyle*, a Marine helicopter pilot drowned after his aircraft crashed into the ocean and the escape hatch, which opened outward, failed to open because of ocean water pressure holding it shut. The family sued the manufacturer, which had manufactured the helicopter pursuant to government design specifications, alleging the hatch design was defective.

In formulating a federal common law defense, the Court characterized it as a form of federal preemption, which will occur provided certain conditions are met. First, "uniquely federal interests" must be identified. The Court identified two areas it had previously found to contain uniquely federal interests, the "obligations to and rights of the United States

under its contracts" and "civil liability of federal officials for actions taken in the course of their duty." *Boyle*, at 504, 505. The Court reasoned these closely related areas of uniquely federal interest apply as well to civil liabilities arising out of the performance of federal procurement contracts. *Boyle*, at 505-06. The Court said the fact that the area of federal procurement of equipment is an area of uniquely federal interest did not end the inquiry, but instead established "a necessary, not a sufficient, condition for the displacement of state law." (Footnote omitted.) *Boyle*, at 507.

The Court then identified a second condition which must be met before the federal defense would apply, *i.e.*, a "significant conflict exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation". (Citations omitted.) *Boyle*, a t 507 (quoting *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 16 L. Ed. 2d 369, 86 S. Ct. 1301 (1966); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 59 L. Ed. 2d 711, 99 S. Ct. 1448 (1979)). The Court said the conflict need not be as great as that which must exist for ordinary preemption, "[b]ut conflict there must be". *Boyle*, at 508. As a limiting principle to aid in identifying when a "significant conflict" arises, the Court looked to the discretionary function exception to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a) (1988), which excepts from the government's consent to suit any claim based upon the exercise of discretionary function on the part of a federal agency or a government employee. In so doing, the Court rejected the view of the Ninth Circuit that the *Feres-Stencel* doctrine acts as a limiting principle. (Under that doctrine, the FTCA does not extend to members of the military who sustain what would otherwise be an actionable wrong, and the United States is not liable to indemnify a private defendant for damages paid to a military person who is injured in the course of military service. *See generally* 3 *American Law of Products Liability 3d* § 45:4, at 15-16 (Timothy E. Travers managing ed., 1990).)

The Court reasoned that the selection of the appropriate design for military equipment is within the discretionary function, as it often involves judgment as to the balancing of many technical, military, and even social considerations, including tradeoffs between safety and greater combat effectiveness. *Boyle*, at 511. Moreover, if state tort claims were allowed against defense contractors, the financial burden of judgments would be passed on to the government in the form of higher prices, contrary to the discretionary function exception purpose to insulate the government from financial liability. *Boyle*, at 511-12.

The Court then agreed with the scope of the displacement of state law as identified in *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 451 (9th Cir. 1983), *cert. denied*, 464 U.S. 1043 (1984):

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle*, at 512. The Court then explained the relationship of these requirements to the discretionary function underpinning the defense:

> The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated — *i. e.*, they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability. We adopt this provision lest our effort to protect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision.

*Boyle*, at 512-13.

*Boyle* concerned a claim involving military equipment. Here, there is no dispute on appeal that the helicopter was a piece of military equipment manufactured according

to precise government design specifications. The fact that the helicopter was later transferred to a private party does not preclude applicability of the defense. *See, e.g., Glassco v. Miller Equip. Co.*, 966 F.2d 641 (11th Cir. 1992) (applying *Boyle* analysis where leather lineman's belt which was manufactured for use by the military in the Korean War broke and allegedly caused injury to civilian who had owned the belt for 5 years). The same policy considerations identified in *Boyle* apply whether the product remains in military use or ultimately ends up in civilian hands.[2] Also, the fact that helicopters in the Huey series were sold commercially does not mean that the helicopter was not military equipment. *See Jackson v. Deft, Inc.*, 223 Cal. App. 3d 1305, 1319, 273 Cal. Rptr. 214 (1990) (where product is manufactured for the military per government specifications within *Boyle* 3-prong test, and incidentally sold commercially as well, the product is still military equipment), *review denied* (Dec. 12, 1990).

Bell argues extensively that it has satisfied *Boyle*'s 3-prong test, but does so with respect to design defect specifications.[3] In fact, the bulk of Bell's argument on this issue is an attempt to show satisfaction of the *Boyle* test with respect to *design* specifications. Bell's position appears to be that compliance with design specifications gives rise to the defense where failure to warn is alleged. Timberline, however, does not dispute on appeal that Bell has complied with design specifications, but takes the position that compliance with design specifications does not give rise to the defense where failure-to-warn claims are at issue.

---

[2]Courts have split on the question whether the federal common law government contractor's defense applies where nonmilitary equipment is manufactured and supplied to the government pursuant to a government contract. *See generally* 3 *American Law of Products Liability 3d* § 45:35-:36 (Timothy E. Travers managing ed., 1990). This issue does not arise in this case; no argument is made here that the helicopter was not military equipment.

[3]Bell claims that Timberline has waived any challenge as to whether Bell has satisfied the 3-prong test of *Boyle*. Timberline has done so with respect to its design defect claim, but has not waived its challenge based on the postmanufacture duty to warn.

■ We agree with Timberline that the federal common law government contractor's defense does not preclude a legitimate postmanufacture failure-to-warn claim where the only compliance with any government contract specifications is with design specifications. For this reason, whether Bell has shown it complied with design specifications is largely irrelevant.

Contrary to Bell's apparent position that compliance with design specifications in accord with *Boyle* gives rise to the common law defense as to any failure-to-warn claim, many courts have held that failure-to-warn claims are independently subject to the *Boyle v. United Technologies Corp.*, 487 U.S. 500, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988) analysis. *See, e.g., Jackson v. Deft, Inc., supra; Garner v. Santoro*, 865 F.2d 629 (5th Cir. 1989); *In re Joint E.&S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626 (2d Cir. 1990) (hereafter *In re Joint Litig.); Dorse v. Armstrong World Indus.*, 716 F. Supp. 589 (S.D. Fla. 1989), *aff'd sub nom. Dorse v. Eagle-Picher Indus., Inc.*, 898 F.2d 1487 (11th Cir. 1990); *In re Haw. Fed. Asbestos Cases*, 960 F.2d 806 (9th Cir. 1992); *see generally* 3 *American Law of Products Liability 3d* § 45:34.

The court in *In re Joint Litig.*, at 630 rejected the argument that compliance with design specifications gives rise to the defense as to a failure-to-warn claim, saying that "we do not see how a federal contract specification requiring a certain product design conflicts with state law requiring a certain set of warnings incident to use of that product or design". The court also rejected the argument that the defense would be rendered a "dead letter" if liability could be imposed for failure-to-warn where it could not be imposed for defective design, saying that

> [a]s the *Boyle* Court pointedly explained, "[C]onflict there must be." *Boyle*, 108 S.Ct. at 2516. To us, a plaintiff's ability to pursue a failure-to-warn claim when *Boyle* may foreclose a design defect claim is not indicative of some loophole inadvertently left open by *Boyle*, but rather demonstrates a crucial lack of the necessary conflict between state and federal warning requirements. Indeed, it is not unreasonable to imagine that . . . government contracts often may focus upon product content and design while leaving other safety-related deci-

sions, such as the method of product manufacture or the nature of product warnings, to the contractor's sole discretion. In these instances, state law design requirements are displaced, although state law warning requirements are not.

*In re Joint Litig.*, at 631.

The court further disagreed that failure-to-warn claims should be subject to the defense where there had been compliance with design specifications because permitting the failure-to-warn claim would lead to pass-through costs from the contractor upon the government. The court said that although the Court's decision in *Boyle* was motivated in part by the desire to limit pass-through costs, that consideration is not dispositive. *In re Joint Litig.*, at 631. If it were, the court reasoned, the Court in *Boyle* could simply have granted military contractors a blanket immunity from all state tort liability. *In re Joint Litig.*, at 631.

This reasoning is sound. The Court in *Boyle* expressly recognized that the government contractor defense would not apply in the case of items purchased from stock, or standard equipment (as opposed to items manufactured in accord with precise government specifications). *Boyle*, at 510. Yet, the financial burden resulting from judgments for defects in stock or standard equipment would be passed on to the government through increased costs, just as in the case of items manufactured per government specifications. Thus, pass-through of costs alone is not a sufficient basis for application of the defense.

The manufacturer in *In re Joint Litig.* also argued that the record there showed that the government had made a discretionary decision not to warn, and that imposing liability for failure to warn would conflict with the exercise of that discretion. The court rejected this argument, in the course of its analysis commenting that

> [s]tripped to its essentials, the military contractor's defense under *Boyle* is to claim, "The Government made me do it." *Boyle* displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations,

thereby limiting the contractor's ability to accommodate safety in a different fashion.

*In re Joint Litig.*, at 632.

This reasoning, that the defense applies in the case of a failure-to-warn claim only if there are precise government specifications pertaining to warnings, has been followed by other courts. *E.g., In re Haw. Fed. Asbestos Cases*, 960 F.2d 806 (9th Cir. 1992); *Jackson v. Deft, Inc.*, 223 Cal. App. 3d 1305, 273 Cal. Rptr. 214 (1990), *review denied* (Dec. 12, 1990). In *Dorse v. Armstrong World Indus., Inc.*, 716 F. Supp. 589 (S.D. Fla. 1989), *aff'd sub nom. Dorse v. Eagle-Picher Indus., Inc.*, 898 F.2d 1487 (11th Cir. 1990), the court agreed that *Boyle* "is not strictly limited to design defect cases", *Dorse*, at 590, but then said that the 3-part test of *McKay* (the 3-prong test of *Boyle*) is necessarily limited to design defect cases. The court held that the government contractor defense did not apply to the failure-to-warn claim because there was no conflict between the state-imposed duty of care and the government contractual duty. The court observed that the government specifications did not contain any prohibitions of warnings on the product, and the manufacturer could have complied with both the state law tort duty and the government contract. *Dorse*, at 591.

Although the present case involves a postmanufacture failure-to-warn claim, much of the analysis in *In re Joint Litig.* applies as well in the context of a postmanufacture failure-to-warn claim as in the context of a claim of failure to warn of defects known at the time of manufacture. There is no inevitable conflict between complying with state tort law postmanufacture warnings requirements and complying with government design specifications; a manufacturer is not compelled by government design specifications to ignore state tort law requiring postmanufacture warnings.

In reaching its conclusion that the government contractor defense applies, the trial court here relied upon an unpublished federal district court decision also involving failure of a 42-degree gearbox in a Huey helicopter used in civilian logging operations. Thompson v. Bell-Helicopter Textron,

Inc., No. 2:89-1492-8 & 2:89-2405-8 (D.C.S.C. Oct. 10, 1990). Much of the unpublished magistrate's report, approved by the District Court, concerns whether the government approved reasonable precise specifications for design. The report briefly addresses the question of a postmanufacture duty to warn, and refuses to impose a state common law duty to warn upon a military contractor. The report reasons that if the third prong of *Boyle* is satisfied as to any design defect, any duty to warn is discharged.

However, the court in *In re Joint Litig.* rejected the notion that any duty to warn is encompassed by the third prong of the *Boyle* displacement test and that this prong is satisfied for all product liability claims where it is satisfied as to a design defect claim. The court in *In re Joint Litig.* noted the difference between the third prong of the *Boyle* test and the tort duty to warn. The third prong of *Boyle*'s test ensures a discretionary decision with the benefit of full knowledge of all hazards. In contrast, state tort law duties to warn have the objective of helping those who use or come into contact with the product to protect for their own safety. "Apart from their common use of the word 'warn,' the two duties bear absolutely no similarity to one another. Consequently, we reject the argument that the third element of the *Boyle* test preempts state law duties to warn." *In re Joint Litig.*, at 632. We agree with this reasoning.

The magistrate's report in Thompson also reasons that the military placed no duty on the manufacturer to give postmanufacture warnings to third party civilian purchasers or operators of helicopters, noting that none of the contracts and specifications included any duty to warn. In this state, RCW 7.72.030(1)(c) sets forth the postmanufacture duty to warn; the statute answers the question about whether, absent the statutory or federal common law government contractor's defenses, Bell would have any duty to issue postmanufacture warnings. The question under *Boyle*, however, is whether the government has imposed a contractual obligation on the manufacturer which is in conflict with state tort law requirements, giving rise to a defense to the

state tort law. Thus, the court's focus in Thompson, on whether the government declined to impose any duty to warn, is not the relevant inquiry when deciding whether the federal government contractor's defense applies in this case. Thompson is not persuasive authority.

Bell also maintains, though, that Timberline's failure-to-warn claim is in fact a design defect claim for purposes of the federal common law government contractor's defense, and that merely labeling the claim a failure-to-warn claim is not determinative. If the failure-to-warn claim is merely duplicative of a design defect claim, there is merit to the argument that the defense should apply if the contractor has satisfied *Boyle v. United Technologies Corp.*, 487 U.S. 500, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988) with respect to design specifications. *Cf. Koutsoubos v. Boeing Vertol*, 553 F. Supp. 340, 344 (E.D. Pa. 1982) (pre-*Boyle* case addressing government contractor defense; where failure-to-warn claim is repetitious of design defect claim, if defense applies to design defect claim, it applies to both).

However, as discussed above with respect to the state statute issue, Timberline says that the helicopter was not defectively designed for its military purposes. Timberline argues that Bell breached a duty to warn of a danger about which it learned after manufacture, *i.e.*, failure of the -9 gear after repetitive heavy lift operations in commercial activity such as logging operations.

In oral argument, Bell's counsel used the facts in *Boyle* by analogy, intending to show that if there had been a failure-to-warn claim in that case, it would have been duplicative of the design defect claim, and arguing that the same is true in this case. In *Boyle*, the manufacturer was required by government specifications to design the helicopter with a hatch door which opened outward. Under the allegations in *Boyle*, if the design had been altered the danger of the hatch failing to open underwater might have been eliminated or reduced. But no warning could have been given which would have reduced the danger resulting from the required design of the hatch door. Thus, the manufacturer had no choice but

to comply with contract specifications and could not have issued any effective warning that would have reduced the danger of water pressure holding the hatch door closed.

Here, Bell designed the -9 gear in accordance with precise government specifications, and could not alter the design, just as the manufacturer in *Boyle* could not alter the design. However, unlike the situation in *Boyle*, a postmanufacture warning could have reduced or eliminated the danger of failure of the -9 gear resulting from repetitive heavy lift operations. As Timberline points out, Bell could have reduced the suggested times between overhauls, suggested alternative means of determining flight hours based upon repetitive lift usage, or prescribed a finite life for the -9 gear. None of these courses would have placed Bell in the position of having to comply with conflicting obligations to follow mandatory government design specifications and to also meet a state tort law duty to give postmanufacture warnings.

Bell maintains that if a defect "inheres" in the design, the claim is not a failure-to-warn claim, but is instead a design defect claim. Bell says that any defect in the -9 gear inhered in the original design, and therefore the government contractor defense protects Bell. The opinion which Bell cites for this proposition addresses the distinction between a manufacturing defect and a design defect, and is thus distinguishable. *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989), *cert. denied*, 494 U.S. 1030, 108 L. Ed. 2d 615, 110 S. Ct. 1479 (1990). Moreover, the court there said that the proper focus in determining whether a claimed defect is a design defect is the protection of discretionary government functions, and if a defect is one inherent in the product approved by the government, it will be covered by the defense. *Harduvel*, at 1317. As explained, the claim here is not a claim that the -9 gear was defective for its military purpose, but that a previously unknown danger exists if the helicopter is subjected to repeated heavy lift operations such as logging. The government's discretionary function is not implicated by Timberline's claim.

Thus, in this case, there is a postmanufacture failure-to-warn claim that is independent of any design defect claim.

Bell says that a further reason for finding the government contractor defense applicable is that holding Bell liable for failing to give a postmanufacture warning would have the same effect as holding Bell liable under a design defect theory, and this would violate *Boyle*. The three cases upon which Bell relies do not support such a broad conclusion. Two of them, at the cited pages, stand for the proposition that the government contractor defense can apply as an affirmative defense to a failure-to-warn claim, because the policy justifications for the defense apply equally well whether the claim is based upon an allegedly dangerous design or a failure to provide adequate warnings. *Nicholson v. United Technologies Corp.*, 697 F. Supp. 598, 604 (D. Conn. 1988); *Niemann v. McDonnell Douglas Corp.*, 721 F. Supp. 1019, 1025 (S.D. Ill. 1989). We agree with this reasoning. However, neither of these cases supports Bell's position that a postmanufacture failure-to-warn claim is precluded in this case. In the third case, the court refused to rule on any duty to warn, saying the issue was inadequately addressed. *Ramey v. Martin-Baker Aircraft Co.*, 656 F. Supp. 984, 1000 (D. Md. 1987). The Fourth Circuit affirmed the District Court, reasoning, however, that the government was already aware of any risk and therefore the failure-to-warn issue need not be addressed. *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946, 951 n.10 (4th Cir. 1989).

Bell also maintains that the defense applies where the government maintains control of the content of flight manuals and revisions to them, and contends that the military maintained such control in this case. In *Nicholson v. United Technologies Corp.*, 697 F. Supp. 598, 602-05 (D. Conn. 1988), the court reasoned that where the government maintained control over the contents of the manual and made revisions to it without consultation with the manufacturer, with government personnel contributing the majority of expertise to the revisions, and where government specifications outlined the requested changes in the manual and

identified the specific pages needing alteration, the defense applied. *See also In re Aircraft Crash Litig. Frederick, Md., May 6, 1981*, 752 F. Supp. 1326, 1366-67 (S.D. Ohio 1990), *aff'd sub nom. Darling v. Boeing Co.*, 935 F.2d 269 (6th Cir. 1991). In its Respondent's Brief, Bell has not identified any similar circumstances in this case, and, in fact, the portion of the record to which Bell cites as showing military control of the manual, Clerk's Papers, at 455; Br. of Resp't, at 44, contains nothing pertinent to this argument. *Nicholson* does not support Bell under these circumstances, and instead supports the proposition that if there had been precise government specifications as to warnings (in a manual or otherwise), and if Bell had complied with those specifications, the federal defense might apply to a failure-to-warn claim.

We hold that the government contractor's defense does not apply to the postmanufacture failure-to-warn claim in this case. Our holding accords with *Boyle* and those courts which hold *Boyle* applies to failure-to-warn claims. First, there is no conflict which would arise by requiring Bell to comply both with the state postmanufacture duty to warn and its obligation to design the helicopter in conformance with precise government specifications for design. Moreover, the postmanufacture failure-to-warn claim, under the facts here, does not implicate the government's discretionary function.

The summary judgment is reversed and this case is remanded for further proceedings.

ANDERSEN, C.J., and UTTER, DOLLIVER, DURHAM, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.