31 P.3d 740 (2001)
CITY OF SEATTLE, EXECUTIVE SERVICES DEPARTMENT, Appellant,
v.
VISIO CORPORATION, Respondent.
No. 47649-1-I.
Court of Appeals of Washington, Division 1.
September 24, 2001.
As Amended October 4, 2001.
*741 Cynthia Seu, Seattle, for Appellant.
Robert Mitchell, Preston, Gates & Ellis, Lance Behnke, Seattle, for Respondent.
AGID, C.J.
The City of Seattle, Executive Services Department ("the Department") appeals a Hearing Examiner's conclusion that it was collaterally estopped from litigating the merits of a business and occupation ("B & O") tax assessment against Visio Corporation, a software company. The Examiner applied collateral estoppel based on an earlier superior court case involving a similar software company that presented the same issue as the challenged assessment here: whether the production of software code constitutes "manufacturing" as defined in former SMC 5.44.028(4). The Examiner also decided not to consider the Department's alternative taxation theory because the record did not support that theory and the original assessment was based on a different ground. We affirm the Examiner's decision.

*742 FACTS AND PROCEDURAL HISTORY
Visio Corporation
Visio is a computer software company that develops business diagramming and technical drawing software. It is undisputed that
During the audit period, Visio conducted the following activities in Seattle: developed and identified ideas for possible development into computer software; wrote and experimented with computer code; identified commercially viable combinations of code ("software"); recorded software code on a master floppy disk, CD, or hard drive; wrote and designed user manuals for use in conjunction with the software; initiated and oversaw marketing plans for the software; and reviewed contracts relating to the software.
Visio developed and licensed three core products during the audit period: Visio Standard (basic business diagramming software), Visio Technical (enhanced diagramming and drawing software for technical professionals like engineers and architects), and Visio Professional (enhanced diagramming and drawing software for information systems and information technology professionals). These products were released in November 1992, December 1994, and January 1997, respectively. During the final months of the audit period, Visio released Visio IntelliCAD 3D (a computer aided design application). In addition to these core programs, Visio developed and released certain add-on software for use with its core products, including Visio Network Equipment, an add-on solution for the design and documentation of local, wide-area and telecommunications networks.
Visio produced the code for these software programs in Seattle and hired third-party contractors outside Seattle to transform the code into boxed software products for distribution to end users. Visio assigned a member of its staff to supervise the contractors' work and furnished the contractors with electronic artwork, packaging and materials specifications, and software code. The code was delivered to the contractors on a floppy disk or a CD, and they used the code to create software CDs. The contractors then put the CDs in plastic cases for protection and printed the user manuals, documentation, and boxes for the software. They assembled the CDs, manuals and documentation, placed these items in boxes, and shrink-wrapped the boxes. The contractors stored or warehoused an inventory of Visio's boxed software on their premises, shipped the software to Visio's customers according to instructions from Visio or its designee, and sent Visio an invoice when the software was shipped. No boxed software inventory was maintained in Seattle. Throughout the audit period, Visio's contractors conducted all activities under their agreements with Visio entirely outside Seattle.
Audit & Assessment
In 1998 the Department audited Visio and on December 21, 1998, issued a $435,652.82 B & O tax assessment.[1] The assessment classified Visio's production of prewritten software in Seattle as manufacturing according to Seattle Rule 5-44-155 and SMC 5.44.400(B). Rule 5-44-155 explains the proper application of B & O taxes to "[p]ersons rendering information or computer services and persons who manufacture, develop, process, or sell information or computer programs[.]"[2] It designates two classes of software"prewritten" and "custom"and taxes software production and licensing differently depending on the class. A "prewritten" program is "software which is not originally developed and produced for the user,"[3] while a "custom" program is "software which is developed and produced by a provider exclusively for a specific user, and which is of an original, one-of-a-kind nature."[4] The Rule deems sales of prewritten software as sales of tangible property: "[T]he sale, lease, or licensing of the computer program is a sale or lease of a product, even though produced through a computer system or process" because sales of "[s]tandard prewritten software programs *743 ... are essentially sales of articles of tangible personal property."[5]
Because Rule 155 characterizes prewritten software as tangible personal property, it taxes licensing prewritten software as retailing or wholesaling and production of prewritten software as manufacturing.[6] At the time of the assessment, the Seattle Municipal Code defined "manufacturing" as follows:
"To manufacture" embraces all activities of a commercial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result thereof a new, different or useful article of tangible personal property or substance of trade or commerce is produced[.][[7]]
Visio filed a timely appeal of the assessment with the Seattle Hearing Examiner on January 11, 1999.
The WRQ Decision
While Visio's case was pending with the Hearing Examiner, and before it had been briefed or argued, the King County Superior Court decided Walker Richer & Quinn, Inc. v. City of Seattle[8] ("WRQ"). That case involved a B & O "manufacturing" assessment identical to the one imposed on Visio for developing software code within Seattle. WRQ alleged that Rule 155's classification of producing a software program as manufacturing was inconsistent with the definition of manufacturing in former SMC 5.44.028(4), quoted above. The trial judge observed: "The Court must therefore determine for itself the legal issue of whether an administrative rule which purports to subject to B & O tax persons who prepare pre-written software in Seattle is within the policy of the ordinances at issue."
The parties to this case agree that the facts in WRQ are identical to those in this case. Like Visio, WRQ is a company that develops, sells, and services computer software that connects personal computers to mainframe computer systems. Its activities in Seattle include research and development of software, sales, marketing, and management. Some of these activities do not result in a product, but for other activities WRQ produces a "master disk" containing code. WRQ sends the master disk to Quebecor in Fife. Quebecor produces the floppy disks or CDs for sale to consumers and warehouses the finished products. Quebecor also ships the finished products to customers directly from the Fife facility.
The trial court determined that WRQ was not a "manufacturer" for purposes of Seattle's B & O taxes, holding that Rule 155 under which a Hearing Examiner had found WRQ was a manufacturer, was inconsistent with the definition of manufacturing activity in SMC 5.44.028(4). The court noted that the meaning of "materials" in the context of the City tax code and consistent with its ordinary dictionary definition, is "that the materials at issue must be of a physical or worldly nature, as opposed to an intellectual or spiritual nature." The court concluded that "[t]he initial writing and recording of intellectual or creative activity cannot reasonably be deemed to be the transformation of physical materials by labor or skill[.]" Therefore, the court determined, "WRQ is not engaged in the activity of `manufacturing' within the meaning of Seattle Municipal Code, SMC 5.44.028(4)" and the assessment was reversed.
The Department appealed the WRQ ruling to this court. While the appeal was pending, the Seattle City Council deleted the word "materials" from SMC 5.44.028(4)'s definition of manufacturing. The Department later settled the case, and the parties dismissed it by stipulation on December 10, 1999, before an appellate decision was rendered.
*744 Proceedings Before the Hearing Examiner
In its appeal to the Hearing Examiner, Visio contended the assessment "incorrectly concludes that [Visio's] activities within the city of Seattle are subject to the B & O tax under the manufacturing classification." According to Visio, it does not engage in any activities within Seattle's boundaries that meet the definition of manufacturing in the City tax code before it was amended. The Department responded that Visio's production of software was manufacturing, and even if it was not, the software production was still taxable according to SMC 5.44.400(F), which taxes all business activity in Seattle not otherwise classified.[9]
The Hearing Examiner ruled that the Department was collaterally estopped from litigating the issue of whether Visio manufactured software in Seattle because the same argument on the same facts was rejected by the Superior Court in WRQ. The Examiner also rejected the Department's argument that Visio was subject to the general business tax, concluding that "[t]he record does not allow such a sweeping conclusion" and "the assessment under appeal is not based on that theory."
Superior Court Proceedings
The Department brought a writ of review of the Examiner's decision under RCW 7.16 and SMC 5.44.120(D). The trial court affirmed the Examiner's decision and this appeal followed.

DISCUSSION
Collateral Estoppel
The Hearing Examiner ruled that the Department was collaterally estopped from litigating whether Visio manufactured software in Seattle "[b]ecause the basis for the assessment in this case is identical to the basis rejected by the Superior Court in the case of WRQ." After citing the four elements of collateral estoppel, the Examiner concluded that each of the criteria was met:
Both WRQ and the instant case involve the identical issue, whether a company that writes software in Seattle, and then sends the code to an entity outside the City to be placed onto disks, boxed, and ultimately shipped, can be considered a "manufacturer";
The Superior Court in WRQ entered a final judgment on the merits;
The City of Seattle was a party in both actions; and,
Application of the doctrine will not work an injustice on the City.
The Examiner noted that the final element is satisfied when the party has been "`afforded a full and fair opportunity to litigate its claims in a neutral forum,'"[10] and concluded that this element was fulfilled because the Department "was represented by counsel in the WRQ case and had the opportunity to argue the case in front of a neutral court." The Examiner also observed that he would not apply collateral estoppel automatically: "There are undoubtedly many cases where differing fact patterns, the passage of time, or other factors would outweigh the reasons for applying collateral estoppel." But he concluded that those factors are not present here:
Instead, we have here two software companies, both operating in virtually identical ways, that engaged in their disputes with the Department during overlapping time periods. Indeed, this appeal was filed during the period before the Superior Court ruling on WRQ, and the Department had full knowledge that this appeal was pending before the Hearing Examiner when it chose not to pursue its appeal of the Superior Court decision.
Finally, the Examiner determined that the City "suffers no on-going damage from the application of collateral estoppel to this case," especially because the City Council had already amended the statute in an attempt to address the WRQ ruling.
*745 The Department challenges the Examiner's application of collateral estoppel. It argues that the goals of nonmutual collateral estoppelrelieving parties of the cost and vexation of multiple lawsuits, conserving judicial resources, and encouraging reliance on adjudication by preventing inconsistent decisionsare outweighed by other considerations in cases where the government is the party being estopped. It relies on United States v. Mendoza,[11] in which the Supreme Court held that nonmutual offensive collateral estoppel could not be applied to the U.S. government because of the geographic breadth of U.S. government litigation, the large volume of cases, and because the U.S. government routinely litigates "legal questions of substantial public importance."[12] According to the Department, the reasons recognized in Mendoza for not allowing nonmutual collateral estoppel against the government apply equally to state and local governments, and collateral estoppel is therefore inappropriate here.
The Hearing Examiner rejected the Department's reliance on Mendoza because: (1) Visio is using the WRQ case in a defensive, not an offensive, manner; (2) Mendoza involved the U.S. government and therefore addressed different policy concerns; and (3) Mendoza involved issues of constitutional due process.
Visio argues that the Mendoza holding depends on the facts and issues presented in that case and did not establish a blanket rule precluding courts from applying nonmutual collateral estoppel to the federal government. According to Visio, "[w]here the Mendoza factors are not directly implicated, nonmutual collateral estoppel may be applied against the federal government." Visio cites United States v. Butner,[13] in which a federal magistrate reviewed Supreme Court decisions on collateral estoppel and summarized them as follows:
(1) Collateral estoppel is inappropriate in cases involving important constitutional questions, (2) if there is a close alignment in both time and subject matter, collateral estoppel is appropriate, and (3) if it is the same issue in essentially the same controversy, collateral estoppel is appropriate.
Based on these principles, Visio contends collateral estoppel would be appropriate here even if the federal government were involved because this case and WRQ: (1) proceeded concurrently, (2) involved the same government officials, (3) did not raise constitutional questions or important questions of tax policy, and (4) presented identical issues. Visio also asserts that Mendoza is not routinely applied to state and municipal governments and that the concerns highlighted in Mendoza "have little or no force outside the federal context."
Courts have disagreed about whether the Mendoza rationale applies to state and local governments. For example, in State v. United Cook Inlet Drift Association,[14] the Alaska Supreme Court rejected the state's attempt to avoid the offensive use of nonmutual collateral estoppel. It held that "[t]he exception to [the nonmutual offensive collateral estoppel] doctrine which the Mendoza court created was one especially fashioned for the federal government as a litigant." The court noted that unlike a federal district court, the superior court's jurisdiction is statewide; a state's attorney general litigates in a single jurisdiction and is faced with a smaller volume of litigation; and new state administrations have many options for pursuing policy initiatives and there is therefore no significant need to preserve policy choices for successive administrations.[15] In contrast, Gould *746 v. Department of Health and Social Services,[16] another case involving offensive use of nonmutual collateral estoppel, an appellate court in Wisconsin deemed the Mendoza rationale applicable to state agencies:
We find the reasoning of Mendoza regarding the differences between government and private litigants to be sound, and applicable in significant respects to state agencies. State agencies ... are much more likely than private litigants to litigate the same legal issue against different parties. The legal issues, however resolved, often have many and complex consequencesfor the government and for other individuals.[[17]]
The Gould court also noted that to hold otherwise would require a state agency to appeal every adverse decision to ensure that it could relitigate the issues against another party.[18]
We recognize that both arguments can be persuasive depending on the circumstances of each case. But we need not decide here whether the Mendoza rationale should apply generally to local governments. Indeed, it would not be advisable to do so because it should be a case-specific determination. We hold that collateral estoppel was proper under the circumstances here because WRQ and this case overlap in time and subject matter, the Department knew this case was pending when it chose not to appeal the WRQ decision, and the issue is no longer significant because the City Council changed the definition of manufacturing after WRQ.[19]
The Validity of Rule 155 After WRQ
The Department contends the WRQ decision renders Rule 155 invalid in its entirety. Thus, according to the Department, Rule 155 is irrelevant and Visio is subject to the City tax code's general business tax provision.[20] There is no support for the Department's contention that Rule 155 was invalid after WRQ.
While WRQ rejected the Department's application of Rule 155's definition of "manufacturing" to production of computer code, nothing in the opinion even remotely suggests that the court was rejecting Rule 155 in its entirety. The Department's claims to the contrary are disingenuous. First, the Examiner made a specific, unchallenged finding that when the City Council amended SMC 5.44.028(4) following WRQ, "the Council specifically noted the WRQ decision, and its approval of Rule 5-44-155." Second, Rule 155 is still shown on the Department's website as a valid rule. Third, it is immaterial that Rule 155 does not have a savings clause. No Seattle tax rule contains such a clause, and the Department offers no authority for applying severability analysis to its interpretive rules. WRQ did not affect the validity of Rule 155.
The City's General Business Tax Theory
The Department argued an alternative theory of taxation before the Hearing Examiner: If Visio's activities in Seattle were not manufacturing, the Department contends they constituted engaging in business and are subject to the general business tax under SMC 5.44.400(F). The Examiner rejected that approach:
The Department argued that if Visio is determined not to be a manufacturer, that its entire revenues must be taxed at the rate set forth in SMC 5.44.40(F) [sic]. The record does not allow such a sweeping conclusion. Moreover, the assessment under appeal is not based on that theory.

*747 Therefore, the liability of Visio under that section cannot be decided here.
On appeal, the Department contends this was error because the Examiner had a "duty to ascertain the correct amount of tax where the Department has misclassified a taxpayer[,] and there is no basis for the Court to create an exception." We disagree and affirm the Examiner's exercise of discretion in rejecting the Department's general business tax theory.
The Department relies on SMC 5.44.120(D) for its characterization of the Examiner's duty.
The Hearing Examiner may reverse or modify an action of the Director and ascertain the correct amount of the tax, fee, interest, or penalty due if the Director's assessment or refund denial violates the terms of this chapter. The decision of the Hearing Examiner shall be final and conclusive unless the decision is reversed or remanded on judicial review.
According to the Department, where the Department has made an error in its assessment, this section obligates the Examiner to impose whatever tax is lawfully due. Even though "may" is the operative term in SMC 5.44.120(D), the Department rejects the notion that the Examiner's power is discretionary, claiming that reading would mean that "the City Council has vested in the Hearing Examiner the power to excuse a tax lawfully owed."
Visio counters that the Department's construction of SMC 5.44.120(D) is "tortuous" and "would render the Hearing Examiner an adjunct tax collector for the Executive Services Department." Visio contends that the role of the Examiner in tax appeals is the same as it is in all other cases, i.e., presiding over the appeal as a neutral decision-maker. And, it is the Director of the Executive Services Department, not the Hearing Examiner, who is responsible for determining the taxes due.
The rules of statutory construction apply to interpreting municipal ordinances as well as state statutes.[21] Courts construe only ambiguous statutes.[22] When the words in a statute are "clear and unequivocal," courts must assume the law-making body meant what it said and apply the statute as written.[23] When a statute is ambiguous, the courts must construe it in a way that effectuates the legislative intent.[24] A statute is ambiguous where it is susceptible to more than one meaning.[25] There is a special rule of construction that applies to tax statutes and ordinances: If there is any doubt about the meaning of a tax ordinance, it must be construed against the taxing authority and in favor of the taxpayer.[26]
With these principles in mind, we hold that SMC 5.44.120(D) only confers discretion on the Hearing Examiner to reverse or modify an assessment. Further, the language of SMC 5.44.120(D) does not give the Examiner license to entertain a tax theory that was not the basis for the original assessment. Rather, the section is focused on evaluating the assessment in question and determining the correct amount.[27] Presumably the City Council intended that if there is more than one taxation ground for a given activity, the original assessment should say so. If the Department does not base the assessment on alternative grounds and the assessment is later reversed, the Department must file a separate assessment based on the alternative ground. The Hearing Examiner performs a quasi-judicial role, reviewing the propriety of action already taken by the executive taxing *748 authority. As such, he reviews the record developed before the appeal was filed. The Examiner must therefore exercise discretion to determine whether the record before him supports an alternative theory. Where the record supports consideration of an alternative theory, the Examiner may consider it, but he had no duty to consider a theory that differs from the one on which the taxing authority had relied in imposing the assessment. Where, as here, the record supports the Examiner's exercise of discretion, we will not disturb it.[28] Our decision does not preclude the Department from initiating a new assessment against Visio under the general business tax theory within the City tax code's limitations.
Affirmed.
WEBSTER and COLEMAN, JJ., concur.
NOTES
[1] During the audit period Visio reported and paid Seattle $125,866.47 in B & O tax.
[2] Rule 155(1).
[3] Rule 155(2)(g).
[4] Rule 155(2)(f).
[5] Rule 155(3)(b). In contrast, creating custom software is considered professional services, which include "the sales of software in connection with custom programs written to meet a particular customer's specific needs." Rule 155(3)(a). Programs associated with custom services "are considered to be the tangible evidence of a professional service rendered to a client." Rule 155(3)(a).
[6] Rule 155(4)(a) and (b), (5)(a). In comparison, Rule 155 taxes the production and licensing of custom software under the general business classification, SMC 5.44.400(F), as a service. Rule 155(4)(c).
[7] Former SMC 5.44.028(4).
[8] No. 98-2-16267-8 SEA.
[9] The measure of this general business is the gross income of the business. SMC 5.44.400(F).
[10] The Examiner cited Nielson v. Spanaway Gen. Med. Clinic, Inc., 135 Wash.2d 255, 264-65, 956 P.2d 312 (1998).
[11] 464 U.S. 154, 158-161, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984).
[12] Id. at 160, 104 S.Ct. 568.
[13] 2000 WL 1842410, at *8 (W.D.Mo. Nov.14, 2000).
[14] 895 P.2d 947, 951 (Alaska 1995).
[15] See id. at 951-52. See also Benjamin v. Coughlin, 708 F.Supp. 570 (S.D.N.Y.1989), aff'd, 905 F.2d 571 (2d Cir.1990) (rejecting without discussion the notion that Mendoza`s rationale should apply to state governments). Visio also cites Local 2839 of AFSCME v. Udall, 111 N.M. 432, 806 P.2d 572 (1991), but that case simply applied collateral estoppel to the state without discussing the Mendoza factors.
[16] 216 Wis.2d 356, 576 N.W.2d 292 (App.1998).
[17] Id. at 298.
[18] An Eleventh Circuit panel has also extended the Mendoza rationale to preclude using collateral estoppel defensively against the state. See Hercules Carriers, Inc. v. Florida, 768 F.2d 1558, 1578 (11th Cir.1985).
[19] We need not determine whether WRQ was correctly decided because collateral estoppel generally operates without regard to whether the first result was erroneous. See Thompson v. State, 138 Wash.2d 783, 799-800, 982 P.2d 601 (1999). We note, however, that we agree with the trial court's conclusion in WRQ. Nothing in Rule 155 covers the development of software in view of the City tax code's definition of "manufacturing" at the time.
[20] We discuss this alternative theory below.
[21] City of Puyallup v. Pac. N.W. Bell Tel. Co., 98 Wash.2d 443, 448, 656 P.2d 1035 (1982).
[22] Whatcom County v. City of Bellingham, 128 Wash.2d 537, 546, 909 P.2d 1303 (1996).
[23] Duke v. Boyd, 133 Wash.2d 80, 87, 942 P.2d 351 (1997).
[24] Whatcom County, 128 Wash.2d at 546, 909 P.2d 1303.
[25] Timberline Air Serv., Inc. v. Bell Helicopter-Textron, Inc., 125 Wash.2d 305, 312, 884 P.2d 920 (1994).
[26] Pac. N.W. Bell, 98 Wash.2d at 448, 656 P.2d 1035.
[27] Indeed, the Department's argument is couched in terms of the Examiner's duty to determine the correct amount, not the correct basis of the tax.
[28] We do not address the unlawful delegation of authority argument because it was not adequately briefed. Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992).