877 F.2d 1231
 Edward R. PHILLIPS, Petitioner, Cross-Respondent,
v.
MARINE CONCRETE STRUCTURES, INC. and United States Fidelity
and Guaranty Company, Respondents, Cross-Petitioners
and
Director, Office of Workers' Compensation Programs, United
States Department of Labor, Respondent.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, Petitioner,
v.
Edward R. PHILLIPS, Marine Concrete Structures, Incorporated
and U.S. Fidelity and Guaranty Company, Respondents.
 Nos. 88-4776, 88-4789.
 United States Court of Appeals,
Fifth Circuit.
 July 10, 1989.
Order on Grant of Rehearing En Banc Aug. 30, 1989.
 
 Stephen A. Anderson, Bryan, Nelson & Allen, Gulfport, Miss., for phillips.
 Paul B. Howell, Franke, Rainey & Salloum, Gulfport, Miss., for Marine Concrete Structures, Inc. and USF & G.
 Nathaniel I. Spiller, Charles I. Hadden, Ann McLaughlin, Secretary of Labor, George R. Salem, Sol. of Labor, U.S. Dept. of Labor, for Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor.
 On Petition and Cross-Petition for Review of an Order of the Benefits Review Board.
 Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.
 JERRY E. SMITH, Circuit Judge:
 
 
 1
 In this case, we are asked to decide three issues relating to whether the Benefits Review Board (BRB) properly determined the amounts of compensation due an injured maritime worker under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. Secs. 901-950. Bound by a decision of a prior panel, we affirm.
 
 I.
 
 2
 Claimant Edward R. Phillips, a supervisor for Marine Concrete Structures, Inc. (the "employer"), suffered a knee injury on May 16, 1977, when he fell from a scaffold while supervising the fiberglassing of barge compartments. Although he initially continued to work after his injury, his condition deteriorated to the point where, on September 14, 1977, he could no longer do so. Between September 1977 and April 1982, Phillips underwent five knee operations.
 
 
 3
 Phillips filed a claim for benefits against his employer and United States Fidelity and Guaranty Co. (collectively, the "employer/carrier") under the LHWCA. The parties submitted the case to an administrative law judge (ALJ), with the parties stipulating that the date Phillips reached maximum medical improvement was November 22, 1979.
 
 
 4
 When the ALJ rendered his decision, however, he rejected that stipulation and determined that Phillips did not reach maximum medical improvement until April 1, 1983. Since he found Phillips's knee injury to be totally disabling, he concluded that Phillips was temporarily totally disabled from September 14, 1977, to April 1, 1983, and permanently totally disabled thereafter. The ALJ also held that Phillips was entitled, in addition to his basic compensation of two-thirds of his average weekly wage during the year preceding his injury, see 33 U.S.C. Secs. 908(a)-(b), 910, to annual cost-of-living adjustments under section 10(f) of the LHWCA from September 14, 1977, the date he first became temporarily totally disabled.[1]
 
 
 5
 Finally, the ALJ determined that, because Phillips had previously suffered an injury to the same knee, the claim involved a second injury subject to section 8(f) of the LHWCA. In accordance with the terms of that provision, the employer/carrier was ordered to pay benefits for the period of temporary total disability (September 14, 1977, to April 1, 1983) and the first 104 weeks of permanent total disability (through March 28, 1985). After that time, the Director, as the administrator of a special fund established by the LHWCA, was made liable for Phillips's benefits.
 
 
 6
 On review, the BRB modified the ALJ's award in several respects. First, it held that the date of Phillips's maximum medical improvement was November 22, 1979, the date agreed upon by the parties and the Director, Office of Workers' Compensation Programs (the "Director"), whose office was now participating in the case. Accordingly, it adjusted the periods of temporary total disability and permanent total disability to end and begin, respectively, on that date.
 
 
 7
 Second, the BRB reversed the ALJ's award of section 10(f) adjustments during the period in which Phillips was temporarily totally disabled, holding that the statute authorized cost-of-living adjustments only to "benefits payable for permanent total disability or death." 33 U.S.C. Sec. 910(f). As to the ALJ's award of section 10(f) adjustments for the period in which Phillips was permanently totally disabled, the BRB felt itself bound to follow this court's decision in Holliday v. Todd Shipyards Corp., 654 F.2d 415 (5th Cir. Unit A Aug.1981); accordingly, it adjusted Phillips's rate of compensation for the period of permanent total disability to include the three intervening section 10(f) adjustments--the adjustments on October 1, 1977, October 1, 1978, and October 1, 1979--that had occurred during the period in which Phillips was only temporarily totally disabled.[2]
 
 
 8
 Finally, the BRB considered how the employer/carrier should be entitled to recoup the overpayments it had made to Phillips when it complied with the ALJ's award. Under the ALJ's decision, which was rendered in April 1985, Phillips received a lump-sum payment from the employer/carrier equal to the total amount of benefits to which he was entitled from September 14, 1977, through March 28, 1985, reflecting the period of his temporary total disability and the first 104 weeks of permanent total disability. The modifications made by the BRB to the ALJ's award meant that the award (1) resulted in an overpayment to Phillips equal to the amount of the section 10(f) adjustments made to his compensation while he was temporarily totally disabled, and (2) erroneously required the employer/carrier to be responsible for payments more than 104 weeks after the onset of permanent total disability (i.e., after November 22, 1981, 104 weeks after November 22, 1979), during which time the special fund was liable for the payments under the statute.
 
 
 9
 As to the latter overpayment, the special fund was required to reimburse the employer/carrier in a lump sum for the benefits for which it, and not the employer/carrier, was liable. As for the former overpayment, reflecting the amount Phillips was paid as a result of the section 10(f) adjustments he received while he was temporarily totally disabled, the BRB ordered the Director to reimburse the employer/carrier for that amount by withholding small increments from future benefit payments made to Phillips until such time as the employer/carrier was made whole.
 
 
 10
 Phillips asks us to review the BRB's order insofar as it directs that the Director repay the employer/carrier for the overpayment received by Phillips from his future benefits.[3] In a cross-petition, both the employer/carrier and the Director request that we overrule Holliday and hold that Phillips is not entitled to have his compensation adjusted while he is permanently totally disabled to take account of the section 10(f) adjustments that occurred while he was only temporarily totally disabled.
 
 II.
 
 11
 The BRB determined that, under the ALJ's award, Phillips received the benefit of three section 10(f) adjustments, during the period of temporary total disability, to which he was not entitled. Accordingly, when the employer/carrier complied with the ALJ's order and paid Phillips a lump sum reflecting all of the benefits to which he had been entitled since September 14, 1977, it overpaid him approximately $3,200. Phillips contends that the BRB erred in ordering that this overpayment be recouped by having the Director withhold small increments from future benefits paid by the special fund and pay them to the employer/carrier.
 
 
 12
 Section 14(j) of the LHWCA, 33 U.S.C. Sec. 914(j), provides:
 
 
 13
 If the employer has made advance payments of compensation, he shall be entitled to be reimbursed out of any unpaid installment or installments of compensation due.
 
 
 14
 There is little question that, if the employer/carrier were still making payments to Phillips, it would be entitled to reimbursement under the statute by withholding the relevant amount from future payments. See Tibbets v. Bath Iron Works Corp., 10 B.R.B.S. 245 (1979). The complicating factor in this case is that the employer/carrier is no longer liable for any payments to Phillips; its liability ended on November 22, 1981, 104 weeks after Phillips became permanently totally disabled. The only party currently paying LHWCA benefits to Phillips is the Director.
 
 
 15
 The question thus is whether the statute allows the BRB to order that an employer/carrier that has made an overpayment but is no longer liable for any future payments be reimbursed from payments made by a third party--in this case, the Director. Both the employer/carrier and the Director contend that it does; for three reasons, we agree.
 
 
 16
 As always, we start with the text of the statute. See Morrison-Knudsen Constr. Co. v. Director, OWCP, 461 U.S. 624, 630, 103 S.Ct. 2045, 2048, 76 L.Ed.2d 194 (1983). The statutory language is broad, allowing reimbursement to be had "out of any unpaid installment or installments of compensation due"; there is no requirement that the reimbursement come from installments still owed by the party that made the overpayment. Simply put, the BRB's order is authorized under the plain language of the statute and does not achieve an "absurd" result; arguably, we need not go beyond the text to resolve this question. See Public Citizen v. Department of Justice, --- U.S. ----, ----, 109 S.Ct. 2558, ----, 105 L.Ed.2d 377 (1989).
 
 
 17
 Even if we proceed to consider the congressional intent underlying section 14(j), we find no reason to reject the BRB and the Director's interpretation of the statute. The purpose of section 14(j) is apparent: If an employer has paid out, and the claimant has received, LHWCA benefits to which it is later found that the claimant is not entitled, the employer should be able to recover those funds. This is a corollary to one of the LHWCA's main purposes, which is to ensure the prompt payment of benefits that may be necessary to a claimant's survival.
 
 
 18
 For that reason, the LHWCA allows a successful claimant to collect an award issued by an ALJ before review by the BRB and places strict limits upon the BRB's power to stay the collection of an award pending review. See 33 U.S.C. Sec. 921(b)(3). In light of these purposes, there is no reason to construe section 14(j) to apply only to those cases in which the employer/carrier can be reimbursed from its own payments.
 
 
 19
 Finally, we note that, as between two reasonable interpretations of a statute, we owe deference to the one proffered by the agency charged with administering it. See Chevron U.S.A. Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984); Miller v. Central Dispatch, Inc., 673 F.2d 773, 779 n. 12 (5th Cir.1982) (deference owed to Director's interpretation of the LHWCA). The Director's interpretation of section 14(j) is most certainly reasonable when viewed in light of both the statutory text and the evident congressional intent.[4] In sum, we conclude that the BRB did not err in interpreting the statute to allow it to order that the employer/carrier be reimbursed for the overpayment it made to Phillips out of future benefits paid to Phillips from the special fund.
 
 III.
 
 20
 Concluding that it was bound by our decision in Holliday, the BRB ordered that Phillips's rate of compensation while he is permanently totally disabled be "inclusive of all intervening section 10(f) adjustments occurring during previous periods of temporary total disability." In their cross-petition, the employer/carrier and the Director ask us to reconsider our decision in Holliday. Were we sitting as a court of first impression, we would be inclined to reach a result contrary to that reached in Holliday; however, since Holliday can be overruled, if at all, only by the court sitting en banc, we are compelled to affirm the BRB's order.
 
 
 21
 The best place to begin is with Holliday itself. In that case, a claimant like Phillips suffered a work-ending injury but, because of uncertainties regarding his potential for improvement, he went through a period of temporary total disability before he was deemed to be permanently totally disabled. To obtain the benefit of section 10(f) adjustments occurring while he was temporarily totally disabled, he sought to have the date upon which the ALJ deemed him to be permanently totally disabled made retroactive to the date of his injury.
 
 
 22
 At oral argument in Holliday, the government attorney representing the Director[5] partially supported the claimant's entitlement to section 10(f) adjustments but disputed his method of obtaining them. At the suggestion of the court, the parties that same day produced a "Proposal for Determining Permanent Total Disability Benefits Under the Longshoremen's and Harbor Workers' Compensation Act." 654 F.2d at 417.
 
 
 23
 In the proposal, the attorney for the Director rejected several alternative methods of calculating permanent total disability benefits after a claimant has previously been temporarily totally disabled. Then, without citation to authority or analysis of the statutory language, that attorney submitted that the proper method of calculating such benefits was to increase the claimant's benefits on the date at which his status switched from temporary total or permanent total disability to include the intervening section 10(f) adjustments occurring while he was temporarily totally disabled. This alternative, the attorney postulated, "is more in keeping with Congressional intent ... and also serves the purpose of Sec. 910(f)." See id. at 421-22 (appendix to the court's opinion). Without independent analysis, the Holliday court accepted and approved the parties' submission. See id. at 417.
 
 
 24
 Contrary to the government attorney's representations in Holliday, however, the Director had for some time been using a method of computation identified and rejected in Holliday: Once a claimant was determined to be permanently totally disabled, he was entitled to a section 10(f) adjustment, on the next October 1, to the compensation rate fixed at the time of his injury, with no adjustment being made for section 10(f) adjustments occurring while he was temporarily totally disabled. See, e.g., Pardee v. Army & Air Force Exch. Serv., 13 B.R.B.S. 1130 (1981). The attorney for the Director in the case sub judice informs us that, although he recognizes the binding force of Holliday, the Director continues to believe that this method of calculation is the proper one under the statute and intends to continue using it in all cases arising outside of the Fifth Circuit. See U.S. Dep't of Labor, LHWCA Circular No. 83-3 (Feb. 23, 1983).[6]
 
 
 25
 Were we free to do so, we would accept the Director's method of calculating permanent total disability benefits following a period of temporary total disability. Again, our first and primary source of guidance must be the statutory text. See supra. The adjustment authorized by Congress in section 10(f) is precisely defined: The adjustment must be equal to the lesser of (1) the percentage increase in the applicable national weekly wage during the last year or (2) five percent. The statute does not contain a "catch-up" clause allowing the adjustment occurring on the first October 1 following the onset of permanent total disability to be greater than that allowed by statute or than that allowed on succeeding October 1's. Nor does it anywhere draw a distinction between those who do, and those who do not, become permanently totally disabled before the first October 1 after their injury. Simply put, the "intervening percentage increases" method of calculation adopted by Holliday finds no warrant in the statutory text.
 
 
 26
 Had Congress desired to sanction this "catch-up" method of calculation, it certainly knew how to do so. Prior to 1972, there was no provision in the LHWCA providing for annual adjustments. When Congress added section 10(f) in 1972, it also added section 10(h), which provided an explicit mechanism for increasing the level of compensation for claimants whose injuries resulted in total permanent disability or death any time prior to October 27, 1972, to roughly the level of compensation for employees injured after that date. See 33 U.S.C. Sec. 910(h)(1); Base Billeting Fund, Laughlin Air Force Base v. Hernandez, 588 F.2d 173, 176 n. 1 (5th Cir.1979). Congress thus knew how to draft a "catch-up" provision to account for inflation occurring during a period of stable compensation; its failure to do so for periods of temporary total disability followed by periods of permanent total disability must therefore be interpreted as intentional.
 
 
 27
 Finally, there is no evidence in the legislative history of the LHWCA that Congress intended such a "catch-up" to occur at the time a claimant's total disability status changed from being temporary to permanent. The House and Senate Reports merely state that section 10(f) is intended to "provi[de] for upgrading benefits in future years for cases of permanent total disability or death benefits." H.R.Rep. No. 92-1441, 92d Cong., 2d Sess. 3 (1972); S.Rep. No. 92-1125, 92d Cong., 2d Sess. 6 (1972), U.S.Code Cong. & Admin.News reprinted in 1972, p. 4700 (emphasis added). Moreover, Congress rejected an earlier version of section 10(f) that would have provided for annual adjustments to all types of disability compensation, partial or total, temporary or permanent. See S. 2318, 92d Cong., 2d Sess., Sec. 11 (1971).
 
 
 28
 In sum, we are persuaded that the Director's interpretation of section 10(f) is correct. The fact remains, however, that the Holliday court, albeit under somewhat unusual circumstances, rendered a decision to the contrary. Although an argument can perhaps be made that the Holliday court was merely placing its stamp of approval upon an agreement reached by the parties in that case, and that Holliday therefore should not be treated as binding precedent, the Holliday decision has been treated as a definitive holding of this court by the Director, the BRB, and the District of Columbia Circuit. Under these circumstances, respect for the judicial process requires us to abide by the rule that, absent an intervening Supreme Court or en banc decision or a change in the statute, one panel of this court cannot overrule the decision of another panel.[7]
 
 
 29
 We invite the court to review the efficacy of Holliday en banc. The order of the Benefits Review Board is AFFIRMED.
 
 ON SUGGESTIONS FOR REHEARING EN BANC
 
 30
 Before CLARK, Chief Judge, GEE, REAVLEY, POLITZ, KING, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, and DUHE, Circuit Judges.
 
 BY THE COURT:
 
 31
 A member of the Court in active service having requested a poll on the suggestion for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,
 
 
 32
 IT IS ORDERED that this cause shall be reheard by the Court en banc without oral argument.
 
 
 
 [1]
 Section 10(f) of the LHWCA, 33 U.S.C. Sec. 910(f), as amended in 1984, reads in pertinent part:
 Effective October 1 of each year, the compensation or death benefits payable for permanent total disability or death arising out of injuries subject to this chapter shall be increased by the lesser of--
 (1) a percentage equal to the percentage (if any) by which the applicable national weekly wage for the period beginning on such October 1, as determined under section 906(b) of this title, exceeds the applicable national average weekly wage, as so determined, for the period beginning with the preceding October 1; or
 (2) 5 per centum.
 Although it is not relevant to this appeal, the ALJ also determined that the 1984 amendments to the LHWCA, Pub.L. No. 98-426, 98 Stat. 1639, 1648, which created the 5% cap on Sec. 10(f) adjustments, did not apply to Phillips's claim. The BRB reversed this determination on review, holding that the cap applied to all adjustments occurring after the date of enactment.
 
 
 [2]
 A hypothetical example illustrates the effects of the BRB's decision upon the ALJ's award. Assuming that Phillips's "average weekly wage" under the statute was $300.00, his rate of compensation starting on September 14, 1977, the date upon which he became temporarily totally disabled, would be $200.00 ( 2/3 of $300.00) per week. Assuming that all Sec. 10(f) adjustments were calculated at 5% (under the ALJ's decision that Phillips was entitled to Sec. 10(f) adjustments while he was temporarily totally disabled), his rate of compensation would increase to $210.00 on October 1, 1977, $220.50 on October 1, 1978, and $231.53 on October 1, 1979. Under the BRB's ruling, however, Phillips's compensation would remain at $200.00 during this period
 As of November 22, 1979, the date upon which Phillips became permanently totally disabled, the BRB's decision that it was bound by Holliday would mean that Phillips's rate of compensation would jump to $231.53, to take account of the Sec. 10(f) adjustments he did not receive while he was temporarily totally disabled. On October 1, 1980, his rate of compensation would increase 5% under Sec. 10(f) to $243.11, and would increase accordingly on each succeeding October 1. In the absence of Holliday, Phillips's rate of compensation on November 22, 1979, would remain at $200.00 until October 1, 1980, at which time his compensation would increase to $210.00 to reflect the Sec. 10(f) adjustment to which he was then entitled.
 
 
 [3]
 In his main brief, Phillips also complained that the BRB ordered that he not receive his first Sec. 10(f) adjustment, inclusive of all adjustments occurring during his period of temporary total disability, until October 1, 1980, the first October 1 after the date (November 22, 1979) as of which he was deemed to be permanently totally disabled. Phillips contended that, under Holliday, he was entitled to receive, as of November 22, 1979, the benefit of the three Sec. 10(f) adjustments occurring while he was temporarily totally disabled
 Without addressing whether this is a correct reading of Holliday, we note that the Director informed us in his brief that the BRB's order was ambiguous on this point and that his records reflect that Phillips's rate of compensation did increase on November 22, 1979, to take account of the intervening Sec. 10(f) adjustments. At oral argument, Phillips's counsel agreed with the Director's representations and acknowledged that there was no factual basis for appeal on this point. We commend counsel for his candor.
 
 
 [4]
 Phillips advances two arguments in support of his contention that the Director's interpretation of Sec. 14(j) is unreasonable. First, he contends that it is inequitable to reduce the amount of benefits which he has been receiving and to which he has become accustomed. Although we can postulate that Phillips may experience some hardship in having his benefits temporarily reduced, the fact remains that Phillips was the beneficiary of an overpayment to which he was not entitled. There is nothing unreasonable or unfair in requiring him to pay that amount back by having his benefits incrementally and temporarily reduced
 Second, Phillips argues that, if the employer/carrier wished to protect itself against having to make an overpayment, it should have petitioned the BRB for a stay of the ALJ's award pursuant to Sec. 21(b)(3) of the LHWCA, 33 U.S.C. Sec. 921(b)(3). But as we have recently held, the employer/carrier's desire to avoid making an overpayment is not a ground for granting a stay of the ALJ's award. See Rivere v. Offshore Painting Contractors, 872 F.2d 1187 (5th Cir.1989). We thus find no merit in this argument.
 
 
 [5]
 Significantly, "[n]either the appellant's employer, Todd Shipyards, nor the employer's carrier, Travelers, participated [in the Holliday appeal or the prior proceedings] before the BRB." 654 F.2d at 417. An essential element of the adversary process--adversariness--was thus lacking in the Holliday appeal, meaning that the interpretation of Sec. 10(f) offered by the Director and the claimant was never critiqued or challenged
 
 
 [6]
 A similar approach has been taken by the BRB. In the first post-Holliday case raising this issue, Brandt v. Stidham Tire Co., 16 B.R.B.S. 277, 281 (1984), the BRB agreed with the Director:
 The Director now argues that the position it advanced in Holliday is not authorized by the Act. We agree with the Director that Section 10(f) provides only for the payment of such adjustments to claimants who are permanently totally disabled.... The method sanctioned in Holliday is an indirect means of providing Section 10(f) adjustments during periods of temporary total disability, contrary to the express language of the statute, and we decline to follow this method of computation.
 On appeal, a panel of the District of Columbia Circuit reversed the BRB's decision in Brandt, principally because it believed that, if the Director wished to correct an error of his own making, the place for him to do it was the Fifth Circuit:
 [W]e accept the Holliday ruling as the proper reading of the statute in this circuit at least until the precedent is overruled in the Fifth Circuit, or the Director publicly announces that, prospectively, he will seek to apply his current interpretation evenhandedly to all similarly disabled claimants in all circuits.
 Brandt v. Stidham Tire Co., 785 F.2d 329, 332 (D.C.Cir.1986). In response, the Director announced that he would seek to apply his consistent manner of calculating benefits to all cases, even those arising in the Fifth Circuit, and that he would appeal any decisions that followed Holliday. See U.S. Dep't of Labor, LHWCA Circular No. 86-2 (Apr. 10, 1986).
 
 
 [7]
 See Umphlet v. Connick, 815 F.2d 1061, 1063 (5th Cir.1987); Koonce v. Quaker Safety Products & Mfg. Co., 798 F.2d 700, 706 n. 8 (5th Cir.1986)