15 P.3d 188 (2000)
103 Wash.App. 916
Matt ESPARZA, Respondent,
v.
SKYREACH EQUIPMENT, INC., a Washington Corporation, Appellant,
William Espy, Debora Espy, and their Marital Community; Leonetta Espy and Adina Espy, both minors, by and through their father as their legal Representative, Plaintiffs.
No. 43379-2-I.
Court of Appeals of Washington, Division 1.
December 26, 2000.
*191 Daniel Gandara, Vandeberg Johnson, PS, Seattle, Andrew Larkin Seiple, Bellevue, for Appellant.
William Scherer Bailey, Seattle, for Respondent Matt Esparza.
Charles Kenneth Wiggins, Bainbridge Island, Dan L. Larson, Seattle, for Respondent William Espy. *189
*190 KENNEDY, J.
Matt Esparza was in a manlift painting a ship when the manlift tipped over, causing him to fall approximately 50 feet to a steel dry dock deck and injuring him severely. Esparza sued Skyreach Equipment, Inc., the company that rented the manlift to his employer, for damages under the theory that Skyreach negligently failed to inspect and test a safety component on the manlift that would have prevented the tip-over if it had been working properly. The jury returned a verdict in favor of Esparza. Skyreach appeals the trial court's (1) denial of its motion to quash a Notice of Trial Attendance to Skyreach's president; (2) admission of testimony from two expert witnesses; (3) denial of its motion for a judgment as a matter of law on the issue of proximate cause; (4) refusal to allow the jury to consider the allocation of fault to the manlift's manufacturer, JLG Industries, Inc.; (5) order striking the jury's allocation of fault to Todd Shipyards, Esparza's employer; and (6) denial of Skyreach's motion to convert the jury's award of future economic damages to a stream of periodic payments. We affirm all but one of the challenged rulings. The trial court erred by refusing to allow the jury to consider allocation of fault to JLG Industries, Inc., on one of the product liability theories argued below, i.e., that adequate warnings or instructions were not provided after the product was manufactured, where the manufacturer learned or should have learned about a danger connected with the product after it was manufactured, and a reasonably prudent manufacturer would have issued such warnings or instructions. Skyreach is entitled to a new trial, not as to its own liability, but as to whether any portion of the fault for Esparza's injury should be allocated to the manufacturer of the manlift.

FACTS
On October 2, 1996, Matt Esparza, a Todd Shipyards employee, was in a manlift painting a ship when the manlift tipped over, causing him and the operator of the manlift, William Espy, to fall approximately 50 feet to a steel dry dock deck.[1] Later, it was discovered that the manlift's circuit cards had been damaged by an excessive dose of electrical current, causing the "load management system" (LMS) to fail to automatically stop further extension of the boom before the manlift could tip over. As a result of the fall, Esparza suffered severe injuries to his head, legs, foot, and ankle and is unable to return to the type of work he did before the fall. Todd Shipyards compensated Esparza under the federal Longshore and Harbor Workers' Compensation Act (LHWCA) for his injuries.
Esparza sued Skyreach Equipment, Inc., the company that rented the manlift to Todd Shipyards, for damages. Esparza claimed, inter alia, that Skyreach failed to inspect, test, and maintain a safety component on the manlift. In Skyreach's answer to Esparza's complaint, it raised the affirmative defense that Esparza's injuries were proximately caused by JLG Industries, Inc., the manufacturer of the manlift, and Todd Shipyards, Esparza's employer.
Before trial, Skyreach moved to quash a Notice of Trial Attendance that Esparza sent to Barry Weaver, Skyreach's Canadian president and owner. The trial court denied this motion, thereby requiring Weaver to attend trial when he was scheduled to testify.
*192 After the parties had presented all their evidence to the jury, Skyreach moved for judgment as a matter of law because it maintained that Esparza had failed to present evidence on the issue of proximate cause. But the trial court denied this motion. The court then prohibited Skyreach from arguing that JLG Industries, Inc., was a nonparty entity to which the jury could allocate fault because the evidence did "not establish that the machine was defective either in design or [that] there was anything negligent about it." Report of Proceedings (6/10/98) at 27.
The jury returned a verdict in favor of Esparza, allocating 67 percent of the fault to Skyreach and 33 percent to Todd Shipyards, and awarding $393,147.25 in damagesincluding $137,285 in future economic damagesto Esparza. Thereafter, the trial court struck the jury's allocation of fault to Todd Shipyards, in accordance with the policies behind the federal LHWCA. The court also denied Skyreach's post-verdict motion to convert the jury's award of future economic damages to a stream of periodic payments under RCW 4.56.260 because Skyreach failed to notify Esparza of its intention to request such relief before the jury returned its verdict. Skyreach appeals. We will describe the relevant evidence in more detail as we discuss the issues, in order to clarify the bases for our opinion.

DISCUSSION
Issue 1: Did the trial court err by denying Skyreach's motion to quash the Notice of Trial Attendance that Esparza sent to Skyreach's president in light of the president's contention that he had no personal knowledge of the circumstances surrounding Esparza's fall or of the day-to-day operations of Skyreach's Seattle office, and that requiring the presidentwho lives in Alberta, Canadato attend the trial was burdensome and unnecessary?
Skyreach maintains that the trial court erred by requiring Barry Weaver, Skyreach's president and owner, to attend and testify at this trial in light of his declaration averring that he had no personal knowledge of the circumstances surrounding Esparza's fall or of the day-to-day operations of Skyreach's Seattle office. It also maintains that requiring Weaverwho lives in Alberta, Canada to attend the trial was burdensome and unnecessary. In response, Esparza contends that Weaver could, and did, provide relevant evidence with respect to corporate policies regarding safety and training.[2]
"[U]nder CR 43(f)(1), nonresident parties and their managing agents may be `compelled' to attend trial in Washington by service of a notice to attend on local counsel." Campbell v. A.H. Robins Co., Inc., 32 Wash. App. 98, 107, 645 P.2d 1138 (1982). CR 43(f)(1) states that a "party, or ... an officer, director, or other managing agent ... of a public or private corporation, partnership or association which is a party to an action or proceeding may be examined at the instance of any adverse party." The rule further provides that for good cause shown, the trial court may make orders for the protection of the party or managing agent to be examined in the manner prescribed by CR 39(b). That rule, in turn, allows the court, upon motion and with appropriate procedural protections, to order that the witness be allowed to testify by telephone or videotape, subject to the provisions of CR 32. "Failure to attend after notice to local counsel may ... result in a contempt order against a party, even where the party is beyond the reach of a subpoena." Campbell, 32 Wash.App. at 107, 645 P.2d 1138.
We reject Skyreach's argument that the trial court should not have required Weaver to attend trial because doing so was unduly burdensome. Skyreach points to nothing in the record indicating that it asked the court to allow Weaver to testify by telephone *193 or videotape in order to reduce the alleged burden of his attendance at trial. Moreover, the trial court ordered that Weaver need only be present for his own testimony, and not throughout the trial, thus reducing such burden as may have existed.
Further, the record reflects that Weaver testified about Skyreach's obligations under contracts between Skyreach and Todd Shipyards, Skyreach's safety procedures, and Skyreach's training of its employees. Thus, despite the fact that Weaver had no personal knowledge of the circumstances surrounding Esparza's fall or of the day-to-day operations of Skyreach's Seattle office, he was able to communicate to the jury relevant information about Skyreach's contractual obligations and safety and training policies. Thus, we need not decide Skyreach's contention that CR 43(f)(1) contains an implicit requirement that an adverse party desiring to examine an officer, director or managing agent make an affirmative showing of necessity. But see Oakview New Lenox Sch. Dist. v. Ford Motor Co., 61 Ill.App.3d 194, 19 Ill.Dec. 43, 378 N.E.2d 544, 547-48 (1978) (holding that a trial court erred by requiring the attendance of a corporate officer under a similar court rule where the officer had no relevant information whatsoever).
Issue 2: Did the trial court abuse its discretion by admitting opinions from two experts on the issues of defective design and causation because these experts were not qualified to render such opinions?
Skyreach maintains that the trial court abused its discretion by admitting testimony from two expert witnesses. Specifically, Skyreach contends that Richard Leonard's opinion that the manlift's circuit cards were not defectively designed was outside his area of expertise. Skyreach also maintains that Steven Forgas was not qualified to testify that the manlift's circuit boards did not fail because of an induced current or because of a malfunctioning voltage regulator, and that the manlift, if properly tested and maintained, would not have failed within a short time after such servicing, absent abnormal operation.
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." ER 702. "But the expert testimony of an otherwise qualified witness is not admissible if the issue at hand lies outside the witness' area of expertise." State v. Farr Lenzini, 93 Wash. App. 453, 461, 970 P.2d 313 (1999). This court reviews the trial court's admission or rejection of expert testimony for an abuse of discretion. State v. Stenson, 132 Wash.2d 668, 701, 715, 940 P.2d 1239 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998).
In this case, when Leonarda licensed civil and structural engineer with 23 years of experience with manliftswas asked if there was "any design defect in this manlift that contributed to this accident," he responded, "[T]here was no design defect, to my knowledge." Report of Proceedings (5/28/98) at 140-41. Nonetheless, Leonard admitted that he did not know what caused the manlift's circuit boards to fail because he was not asked to test the circuit boards. Leonard also agreed that an electrical engineer would be the appropriate person to perform such a testand Skyreach called an electrical engineer to testify with respect to the circuit boards. Contrary to Skyreach's contentions, Leonard never testified that the manlift's circuit cards were not defectively designed, but only that, so far as he knew, there was no design defect with respect to the manlift generally. Because Leonard did not testify that the design of the circuit boards was not defective, and specifically disavowed any knowledge or opinion with respect to that question, his testimony was not outside of his area of expertise. We conclude that the trial court did not abuse its discretion by admitting it at trial.
The other expert testimony that Skyreach challenges is from Forgas, the product safety and reliability director for JLG Industries, Inc., the manlift's manufacturer, who has monitored the safety of the manlifts for 15 years, who has designed aspects of electrical *194 systems on manlifts, who has investigated accidents like the accident in this case, and who has supervised preparation of safety manuals and training programs designed to prevent accidents like the one in this case. Forgas is also his company's representative to the American National Standards Institute (ANSI), which is developing the next generation of Institute standards for manlifts like the one in this case. He personally investigated the cause of this accident, and testified in considerable detail and without objection to his findings with respect to the blown-out circuit cards and the resulting failure of the LMS. When asked if an "induced current from power cables in the area" would cause failure of the circuit cards, Forgas testified, over an objection for lack of a foundation, that he did not "know of any occurrences as far as damage to the [manlift's] circuit cards occurring from being operated around power lines or magnetic fields or electrical fields[.]" Report of Proceedings (6/2/98) at 206-07. Forgas also testified that he has investigated accidents where this model of manlift has actually contacted power lines, and found the LMS to be working fine afterwards.
Forgas also opined that the "voltage regulator did not cause the damage to the [circuit] cards on this machine." Id. at 208. Then, in response to a hypothetical scenario in which proper maintenance was performed days earlier, Forgas testified that the manlift would not have failed absent abnormal operation:
If a piece of machinery is properly serviced and maintained prior to going out of rental, everything was checked to make sure it was operating safely and properly, and by virtue of that the product isn't likely to fail within a couple of days of being out on the job site unless something unusual happens from abnormal operation or operation not in accordance with [the manufacturer's] instructions would cause a failure of a certain part.
Id. at 255. Based on Forgas's experience monitoring the safety of and designing electrical systems for manlifts and investigating accidents involving circuit board failures, he was qualified to render opinions on the possible causes of the manlift's circuit board failure in this case. We reject Skyreach's argument that because Forgas's engineering degree was in agricultural engineering rather than electrical engineering, he was not qualified to testify as he did. Forgas testified that part of his formal education included electrical engineering courses, and his on-the-job training and experience over a period of many years provided the trial court with an ample basis for admitting his testimony. We conclude that the trial court did not abuse its discretion by admitting Forgas's opinions at trial.
Issue 3: Did the trial court err by denying Skyreach's motion for a judgment as a matter of law on the issue of proximate cause because Esparza failed to present evidence that the excessive dose of electrical current that damaged the manlift's circuit cards was generated before the day of the accident?
Skyreach urges this court to "dismiss [Esparza's] claims for failure to present evidence of proximate cause" because Esparza presented no evidence to indicate when the circuit cards on the manlift failed. The trial court rejected this argument when, at the close of evidence, it denied Skyreach's motion for judgment as a matter of law on the issue of proximate cause.
"When reviewing a trial court's decision to deny a motion for judgment as a matter of law the appellate court applies the same standard as the trial court." Sing v. John L. Scott, Inc., 134 Wash.2d 24, 29, 948 P.2d 816 (1997). The judgment as a matter of law rule, CR 50(a), states:
If, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find ... for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against the party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue.
In deciding whether to grant a motion for judgment as a matter of law, the court must view all conflicting evidence in the light most favorable to the nonmoving party and determine *195 whether the proffered result is the only reasonable conclusion. Hollmann v. Corcoran, 89 Wash.App. 323, 331, 949 P.2d 386 (1997).
Here, Skyreach's contention is that there is no legally sufficient evidentiary basis for a reasonable jury to find that Skyreach's failure to test the manlift factually caused Esparza's injuries because Esparza presented no evidence to indicate that the circuit cards had failed at a time when Skyreach should have discovered the failure.
Various experts testified that they personally did not know when the circuit cards failedwhether it was moments before the accident or weeks before the accident, but they unanimously agreed that it was the failure of the circuit boards that caused the failure of the alarm system that was intended to alert the manlift operator that tip-over was imminent, and that caused the automatic shut-down device that would have prevented the operator from moving the boom of the manlift into tip-over position not to function. And it was virtually undisputed that Skyreach had not been regularly testing the load management system, did not do so at its inspection 5 days before this accident, had not sent its mechanics to the contractually mandated training programs offered by JLG Industries to teach them how to perform this vital safety inspection, and that the mechanic who checked the machine out on the morning of the accident didn't know how to perform such an inspectiondidn't even know that he was supposed to do it.
Forgas testified that if the circuit cards were functioning properly 5 days before the tip-over, they still should have been functioning properly on the day of the tip-over, unless the manlift had been operated in some abnormal manner during the intervening timeand there was no evidence presented of any such abnormal operation. In fact, both William Espy, who was operating the manlift at the time it tipped over, and the man who had operated it on the previous shift that same day testified that there was nothing abnormal about their operating procedures. Espy denied getting the manlift anywhere near any power lines that day, and while another expert testified that operating near power lines could have caused the circuit boards to fail, Forgas did not believe that to be the case and the jury was entitled to believe Forgasor if doubting the validity of his opinion, to believe Espy that he didn't get close to power lines in any event.
There was also evidence, albeit disputed, from which a rational juror could have found that the damage to the circuit boards more likely than not occurred when some welding was done on the manliftbecause the other possible reasons for the failure described by the experts did not seem as likely in view of other evidenceand the welding was done before the inspection that Skyreach should have done but did not do, 5 days before this accident, and should have done but did not do again on the morning of the accident. Thus, the recordviewed in Esparza's favorreflects a reasonable inference that proper inspections 5 days before the fall and on the morning of the fall more likely than not would have revealed that the manlift's circuit boards, and consequently the automatic shut-off mechanism (LMS) were not functioning properly at that time. Based on this record, we agree with the trial court that there was a legally sufficient evidentiary basis for a finding that Skyreach's negligent failure to properly inspect, test and maintain the circuit cards proximately caused Esparza's injuries. See Schooley v. Pinch's Deli Market, Inc., 134 Wash.2d 468, 478, 951 P.2d 749 (1998) (explaining that factual causation is based on "a physical connection between an act and an injury"). Accordingly, Skyreach was not entitled to judgment as a matter of law with respect to proximate cause, and the trial court did not err in submitted the issue to the jury.
Issue 4: Did the trial court err by refusing to allow the jury to consider the allocation of fault to the manlift's manufacturer, JLG Industries, Inc.?
Skyreach contends that the trial court erred by refusing to allow the jury to allocate fault to the manlift's manufacturer, JLG Industries, Inc., in light of one qualified expert's opinion that the circuit cards aforementioned were defectively designed.
*196 Larry Koler, an electrical engineer, testified that the cards were defectively designed because each contained a transistor that would blow out at a very low level of three amps, each was left unprotected by relays or circuit breakers to prevent external power of substantially greater amperage from getting to the transistors, and the two cards were connected so that they could be blown out simultaneously, thus destroying the safety goal of redundancy. Koler testified further that safety systems that are truly redundant are never connected and these cards were connected in such a manner that, if one were blown out by an excessive dose of power, the other would be blown out, as well. As a result, the two safety systems that were intended by JLG to be redundant, that is to operate independently of one another, so that if one mechanism failed the other would still work, could be blown out simultaneously and in fact, the transistors on both cards had been blown and that is why both the warning alarm system and the LMS failed and the manlift tipped over.
Forgas had testified earlier that JLG had redesigned the circuit cards to add a fuse that acts as a circuit breaker in the event too much power tries to reach the vulnerable transistor, and then resets itself. Koler testified that if these newer cards, which JLG designed in response to customer requests for more reliable cards, had been in place on the manlift, both cards would not have blown out at once, and the accident would have been prevented.
Forgas had earlier testified that JLG had not notified its customers of the availability of the newly designed cards, nor warned them that the older cards were vulnerable to simultaneous blow-out and that the self-resetting fuse would obviate that risk. Forgas testified that JLG had not done so because there had been only one manlift tip-over previous to this accident, and some 420 manlifts were in the field, so that the machine had a very reliable safety record. Forgas also testified that JLG's load-management and warning systems were the best in the industry. But he further testified that the earlier tip-over accident, 3 years before the accident in this case, also happened because both circuit cards were not functioning, and the operator of the machine failed to discover that fact by checking the safety devices before operating the machine.
Although Koler was allowed to testify that the circuit cards were defectively designed, he testified that he had no knowledge of industry standards with respect to manlifts. It was undisputed that the model of manlift here at issue meets industry standards set by the ANSIalthough those standards do not specify standards for the design of circuit cards that are a component of the manlifts.
In actions claiming fault of two or more entities, the trier of fact must determine the percentage of total fault attributable to each and every non-immune entity that caused plaintiff's damages. In a tort case, the party alleging fault must show that each entity "caused the claimant's damages[.]" RCW 4.22.070(1). And to allocate fault to an entity in a products liability case, the party alleging fault must demonstrate that the entity's product was "not reasonably safe as designed[.]" RCW 7.72.030(1). To demonstrate that an entity's product was "not reasonably safe as designed," a trier of fact may consider whether the entity's product has complied with legislative or administrative regulatory standards. Soproni v. Polygon Apartment Partners, 137 Wash.2d 319, 328, 971 P.2d 500 (1999). But such compliance is not conclusive; rather, it "is merely relevant evidence that may be considered by the trier of fact." Id.
After hearing all the evidence, the trial court concluded that Skyreach failed to present "competent evidence ... that the machine was defective either in design or [that] there was anything negligent about it." Report of Proceedings (6/10/98) at 27; see also id. at 30. The trial court's decision was based, at least in part, on the fact that Koler "did not hold himself out to be an expert in the design of manlifts or what the industry standards were for manlifts." Id. at 27. The court reasoned further that all Skyreach had been able to show was that JLG may have tried to design a better safety system than others on the market and may have come up short in reaching its goal, but that *197 does not establish that the machine was defective in design.
We agree with the trial court's analysis with respect to Skyreach's theory that the manlift was not reasonably safe as designed, but that was not Skyreach's only product liability theory below. Washington's product liability statute, RCW 7.72.030, provides that a product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer (1) because the product was not reasonably safe as designed or (2) not reasonably safe because adequate warnings or instructions were not provided. RCW 7.72.030(1).
With respect to the latter basis, a claimant may show that a product is not reasonably safe because "adequate warnings or instructions were not provided after the product was manufactured where a manufacturer learned or where a reasonably prudent manufacturer should have learned about a danger connected with the product after it was manufactured." RCW 7.72.030(1)(c). That subsection goes on to provide that, in such a case, "the manufacturer is under a duty to act with regard to issuing warnings or instructions concerning the danger in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances. This duty is satisfied if the manufacturer exercises reasonable care to inform product users." Id. And, under RCW 7.72.030(3), "[i]n determining whether a product was not reasonably safe [under RCW 7.72.030] the trier of fact shall consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer." RCW 7.72.030(3).
Skyreach argued both theories of product liability in the hearing on Esparza's motion to prohibit Skyreach from arguing that the jury should allocate fault to JLG Industries under a product liability theory. Skyreach also proposed jury instructions that contained a verbatim recitation of the "adequate warnings or instructions" provisions of RCW 7.72.030(1)(c).
It is not crystal clear from the oral ruling on Esparza's motion that the trial court focused on this second basis for products liability, for the court only said that Skyreach had failed to present competent evidence that the manlift was defectively designed or that "there was anything negligent about it." If by "it" the trial court meant that Skyreach failed to present competent evidence that the manufacturer learned or should have learned about a danger connected with the product after it was manufactured, and failed to give adequate warnings or instructions about the danger when a reasonably prudent manufacturer would have issued such warnings, we respectfully disagree.
JLG's director of product safety and liability, Mr. Forgas, testified that, in response to customer complaints about reliability of the circuit cards, JLG developed the self-resetting fuse that prevented excess current from reaching the transistors that Koler testified were the "weak link" in the safety system. Three years before the accident in this case, another manlift tipped over because both circuit cards had failed, disabling the load management and warning systemsthe same kind of failure that resulted in the accident in this case.
Forgas also testified that part of his duties was to monitor parts replacements, and that about half the time when customers ordered new circuit cards they ordered both cards instead of just one of themalthough he did not know whether that was because both cards had failed or because some customers merely wanted to build up their card inventory.
Forgas testified that JLG decided not to issue any warnings or instructions with respect to replacing the old cards with the newly designed cards containing the self-resetting fuse because JLG already had the best safety system on the market and the old cards had proved reliable in the field40 manlifts in the field and only one previous tip-over accident due to faulty cards, prior to this one. But Leonard, the civil and structural engineer with 23 years of experience with manlifts testified that warnings or instructions with respect to replacing the old cards with the newly designed cards should have been issued. And Koler testified that if the manlift in this case had been fitted with *198 the new cards containing the self-resetting fuse, the surge of current that caused the circuit cards to fail would, instead, have triggered the circuit breaker, which would have then re-set itself, preventing the failure of the LMS in this case, thereby preventing the tip-over.
A product may be reasonably safe as designed but nevertheless not reasonably safe because of a danger connected with the product that the manufacturer learned about or should have learned about after the product was manufactured. See generally Timberline Air Serv., Inc., v. Bell Helicopter-Textron, Inc., 125 Wash.2d 305, 327-30, 884 P.2d 920 (1994). See also Hernandez v. Badger Construction Equip. Co., 28 Cal. App.4th 1791, 34 Cal.Rptr.2d 732 (1994) (jury's finding of negligence based on failure to conduct an adequate retrofit campaign may be reconciled with the jury's finding that there was no design defect in the crane). As our Supreme Court put it in the Timberline Air Service case, albeit in another context from this one, "[S]tate tort law duties to warn have the objective of helping those who use or come into contact with the product to protect ... their own safety." 125 Wash.2d at 327, 884 P.2d 920.
The evidence with respect to failure to warn in Timberline Air Service is similar to the evidence in this case. Timberline sued the manufacturer of a military helicopter that had been designed in accordance with precise mandatory government specifications, and there was no dispute that the design, including the design of the 42 degree gear box and -9 gear was in compliance with those government specifications. Moreover, the helicopter was reasonably safe for the military purposes for which it was designed, and there was no contention that the product had a design defect at all. Rather, this was a pure failure to warn case.
The government sold the helicopter to Timberline, who placed it in commercial use for repetitive lifting of heavy logs. The manufacturer knew by then that the -9 gear was vulnerable to failure after repetitive heavy lift operations, and knew or easily could have determined who the civilian owners and operators of the former military helicopters were. After four crashes of these helicopters due to failure of the -9 gear while the helicopters were in civilian use for repetitive heavy lifting operations, the manufacturer notified the FAA about the danger but failed to warn the civilian owners and operators of the danger and to suggest mitigating procedures, such as suggesting reduced time between overhauls, suggesting alternative means of determining flight hours based on repetitive lift usage, and prescribing a finite life for the -9 gear. The accuracy of these factual assertions was conceded for purposes of the appeal of the summary judgment order dismissing Timberline's claimthe outcome of the appeal involved legal issues relating to Washington's statutory government contractor's defense to a product liability claim. 125 Wash.2d at 308-311, 884 P.2d 920.
Here, there had been only one previous tip-over of a manlift due to the failure of both circuit cards, in contrast with four helicopter crashes as in Timberline, but the new design adding the self-resetting fuse to the circuit cards had been done in response to customer complaints about reliability of the cards, and with only 420 manlifts in the field, notifying the customers of the availability of the new cards and the resulting improvement in both safety and reliability would seem to have been relatively easy. See Ayers v. Johnson & Johnson Baby Prods. Co., 117 Wash.2d 747, 751, 763, 818 P.2d 1337 (1991) (affirming a jury verdict in a failure to warn case in favor of parents and guardian ad litem of a 15 month old child who suffered irreparable brain damage after aspirating baby oil; holding that a trier of fact must weigh the likelihood and seriousness of potential harm against the ability of the manufacturer to provide an adequate warning; concluding that although likelihood of a baby aspirating baby oil was low, the potential harm was serious, and placing a warning label on the bottle of baby oil was relatively easy and inexpensive).
The general rule is that a post-sale duty to warn arises after a manufacturer has sufficient notice about a specific danger associated with the product. Michael A. Matula, Manufacturers' Post Dale Duties in the 1990s, 32 Tort and Ins. Law Journal 87, 105 *199 (citing Patton v. Hutchinson Wil Rich Mfg. Co., 253 Kan. 741, 861 P.2d 1299, 1314 (1993)). Whether the manufacturer, which is held to the standard of an expert in the field, had sufficient notice is a factual question, generally to be decided by the jury. Id. (citing Patton, 861 P.2d at 1315). The most convincing proof that a manufacturer knew of a dangerous condition associated with its product is that the manufacturer knew about previous substantially similar accidents involving the product. Id. at 109, 861 P.2d 1299. Whether a manufacturer has a duty to warn is a question of law for the court. Id. at 118, 861 P.2d 1299 (citing Ramstad v. Lear Siegler Diversified Holdings Corp., 836 F.Supp. 1511, 1517 (D.Minn.1993). See also Douglas R. Richmond, Expanding Products Liability: Manufacturers' Post Sale Duties to Warn, Retrofit and Recall, 36 Idaho L.Rev. 7, 30, 41 (1999).
We have no difficulty concluding that there was a duty to warn in this case, so long as a rational trier of fact determines that JLG had or should have had sufficient notice about the specific danger associated with its product, namely the danger of both circuit cards failing at once due to a current surge, for our Legislature has already made that determination. See RCW 7.72.030(1)(c) (where a manufacturer learned or a reasonably prudent manufacturer should have learned about a danger connected with its product after it was manufactured, the manufacturer is under a duty to act with regard to issuing warnings).
The danger of both cards failing at once may be relatively low but the seriousness of the danger is grave, given that the manlift raises workers up to 110 feet above the ground and the warning devices and automatic shut-down devices are the only means of preventing the boom from extending into the tip-over danger zoneand here, there is ample evidence from which a trier of fact could determine that warnings could have been issued with relative ease.
There is also sufficient evidence from which a trier of fact could determine that JLG's failure to warn was a proximate cause of Esparza's injuriesin that there is evidence that installation of the newer cards would have prevented both circuit cards from failing at once.
Skyreach is entitled to a new trial on the question of whether JLG Industries, Inc., should share in the liability for Esparza's injury, and if so, by what percentage of fault in comparison to that of Skyreach.
Issue 5: Did the trial court properly strike the jury's allocation of fault to Todd Shipyards?
After the jury returned its verdict in this case, the trial court struck the jury's allocation of fault to Esparza's employer, Todd Shipyards, in accordance with the purposes and policies behind the federal Longshore and Harbor Workers' Compensation Act (LHWCA)which the trial court correctly determined to be prompt, full and complete compensation to the injured worker and to entitle the worker's employer to recover from third party tort feasors successfully sued by the employee (or from the employee himself or herself) the full measure of the compensation paid to the employee under LHWCA, without adjustment due to the comparative fault of the employer vis-à-vis the third party. See Stevedoring Serv. of America, Inc., v. Eggert, 129 Wash.2d 17, 37, 914 P.2d 737 (1996) (one of the main purposes of LHWCA "`is to ensure the prompt payment of benefits that may be necessary to a claimant's survival'" (quoting Phillips v. Marine Concrete Structures, Inc., 877 F.2d 1231, 1234, (5th Cir.1989), reh'g granted and opinion reinstated in relevant part, 895 F.2d 1033 (5th Cir.1990)). See also Schreefel v. Okuly, 143 Cal.App.3d 818, 822, 192 Cal. Rptr. 402 (1983) (LHWCA entitles employer to recover benefits paid without adjustment due to comparative fault of the employer) (citing Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 271-73, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979)).
Skyreach argues that the trial court's deference to the "presumed federal policy" behind the LHWCA was error because "Skyreach was entitled to have the jury make an allocation of liability to Todd [Shipyards] under RCW 4.22.070." Appellant's Br. at 36.
*200 RCW 4.22.070 states: "In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages except entities immune from liability to the claimant under Title 51 RCW[,] the Industrial Insurance Act]." RCW 4.22.070(1). Our Legislature added the Title 51 RCW entities exception to preserve industrial insurance employers' ability to recover benefits paid from at-fault parties. Gilbert H. Moen Co. v. Island Steel Erectors, Inc., 128 Wash.2d 745, 759 n. 7, 912 P.2d 472 (1996).
RCW Title 51 expressly does "not apply... to employers and workers for whom a right or obligation exists under the maritime laws or federal employees' compensation act for personal injuries or death of such workers." RCW 51.12.100(1). See also RCW 51.12.100(4) which provides that in the event payments are made under Title 51 prior to a final determination of coverage under the maritime laws, such benefits shall be repaid by the worker if recovery is subsequently made under the maritime laws.
Accordingly, absent federal pre-emption, a literal application of RCW 4.22.070(1), which exempts only entities immune from liability under Title 51 RCW, would require us to reinstate the jury's allocation of fault to Todd Shipyards, because Todd Shipyards is immune under LHWCA, not under Title 51 even though both statutory schemes preserve employers' rights to recover benefits paid to injured workers from third-party tort feasors.
We believe this would be an absurd result, and not one that our Legislature could have intended. "In interpreting statutory provisions, `[t]he fundamental objective... is to ascertain and carry out the intent of the Legislature.'" State v. Alvarez, 128 Wash.2d 1, 11, 904 P.2d 754 (1995) (footnote omitted) (alteration in original). Moreover, this court must construe statutes to avoid strained or absurd results. State v. Akin, 77 Wash.App. 575, 580, 892 P.2d 774 (1995).
The absurdity of literal application becomes even more apparent when one considers that one of the purposes of LHWCA's provisions allowing the employer to recover benefits paid without reduction for the employer's fault is to prevent double recovery by the workerthat same purpose being apparent from the provisions of RCW 51.12.100 that require the worker to repay state benefits he or she may have received, if recovery is made under the maritime laws. See E.P. Paup Co. v. Director, Office of Workers Compensation Programs, 999 F.2d 1341, 1350 (9th Cir.1993). Yet, to allow a third party tort feasor to allocate fault to an injured worker's employer would restrict the employee's recovery as against the third party without the worker acquiring any offsetting rights against the employerwhose rights under LHWCA include a subrogation lien against the worker's recovery from a third party without reduction for the employer's fault. Thus, a literal application of RCW 4.22.070(1) would result in the injured worker effectively paying twiceonce by means of a reduced recovery for fault allocated to the employer, and a second time when the employer exercises its subrogation lien against the worker's recovery without reduction for the employer's fault. See Dodge v. Mitsui Shintaku Ginko K.K. Tokyo, 528 F.2d 669, 672 (9th Cir.1975); 33 U.S.C.A. §§ 933, 933(b) (1986).
In view of these absurdities, and as an alternative to venturing into the complex arena of federal preemption analysis, Esparza suggests that we simply construe RCW 4.22.070(1) to mean that Todd Shipyards is "immune from liability to the claimant under Title 51 RCW" within the meaning of RCW 4.22.070(1) because Todd Shipyards is immune under a substantially similar workers compensation statute, here, LHWCA. As tempting as this invitation is, we elect to decide the issue on the same basis as the trial court, namely that the plain language of RCW 4.22.070(1) must give way to the LHWCA statutory scheme because to allow the jury's allocation of fault to Todd Shipyards to stand would conflict with the provisions of LHWCA that permit the employer to exercise a subrogation lien against an injured worker's recovery from third-party tort feasors without regard to fault of the employer. The trial court ruled correctly. See Stevedoring Services, 129 Wash.2d at 36, *201 914 P.2d 737 (state law that actually conflicts with federal law is preempted).
LHWCA enables the injured person to recover compensation for injuries from the person's employer "irrespective of fault as a cause for the injury." 33 U.S.C.A. § 904(b) (1986). After compensating the injured person, the employer is entitled to recover its expenses where the injured person recovers from an at-fault third party. 33 U.S.C.A. § 933. The third party is not entitled to contribution as against the employer. Dodge, 528 F.2d at 671. To shift the employer's fault to the injured worker by allocating fault to the employer to reduce the third party's recovery would be unfair to the worker because the worker would not acquire any offsetting rights against the employer's subrogation lien on the worker's recovery. Id. at 672.
That the trial court's ruling was correct becomes even more apparent when one considers the full meaning of 33 U.S.C.A. § 933those provisions of LHWCA that implement and preserve the employer's right to recover benefits and compensation paid under LHWCA for injuries where third persons are liable. Under subsection (b) of that section, by accepting benefits under LHWCA, the injured worker assigns to the employer all rights to recover damages against third-person tort feasors unless the worker commences an action against the third person within 6 months of accepting benefits. Under subsections (e)(1) and (2), if the employer commences suit, or compromises the claim short of suit, the employer may retain an amount equal to all the expenses of the suit or compromise, including a reasonable attorney fee, may recover the cost of all benefits actually furnished to the employee, may recover all amounts paid as compensation to the employee, may recover the present value of any future compensation and benefits owed to the employee, and only then must pay any excess over to the injured worker.
Under subsection (g), on the other hand, if the injured worker timely commences suit against the third party, the worker cannot settle the claim for less than the full amount of benefits and compensation he or she is entitled to under LHWCA except by written agreement with the employer in advance of such settlement, and if the worker fails to obtain such agreement but settles anyway, he or she forfeits all rights to any additional compensation and medical benefits due under the act. And the same goes for any judgment the injured worker may obtain against the third partythe worker must notify the employer of the judgment or all benefits due are terminated. And by the provisions of subsection (i), the remedies provided by LHWCA shall be the employee's exclusive remedy.
All of these provisions and other provisions of maritime law that were in effect when LHWCA was passed, and which Congress did not intend to abrogate by passing the act, secure the employer's right to recover either from the third party directly or from the worker himself or herself the full measure of compensation paid under LHWCA without reduction for attorney fees, without contribution, without indemnity unless there is an indemnity agreement, and without adjustment due to the comparative fault of the employer vis-à-vis the third party. Schreefel, 143 Cal.App.3d at 822-23, 192 Cal.Rptr. 402.
Although we deal with an issue of first impression in Washington, the Schreefel court in California has previously determined, for these same reasons, and for the reasons outlined by the United States Supreme Court in Edmonds, 443 U.S. at 271-73, 99 S.Ct. 2753 that California's comparative fault principles must give way to the directly conflicting provisions of LHWCA and judge-made admiralty law of which Congress was fully aware when it enacted LHWCA, based on supremacy principles. 143 Cal.App.3d at 825, 192 Cal.Rptr. 402. See also Hernandez v. Badger Construction Equip. Co., 28 Cal.App.4th at 1825, 34 Cal. Rptr.2d 732 (Schreefel was correctly decided); at 1808-11 (but Schreefel applies only to economic damages recovered by the worker from the third party; California statute limiting defendants' joint liability to economic damages and shielding every defendant from any share of noneconomic damages beyond that attributable to his or her own fault not preempted because employer's right to recoup its Longshore Act workers compensation *202 benefits not abridged by applying statute to noneconomic damages only).
In sum, although the plain language of RCW 4.22.070(1) conflicts with the federal scheme, so that the federal scheme must prevail to the extent of such conflict, in actual fact, the federal and state immunity schemes complement each other and serve the same purposeprompt payment of benefits to the injured worker and immunity from allocation of fault to the employer. See Stevedoring Services, 129 Wash.2d at 37, 914 P.2d 737; Moen, 128 Wash.2d at 759 n. 7, 912 P.2d 472; Schreefel 143 Cal.App.3d at 822, 192 Cal. Rptr. 402. Thus, our Legislature is saved from an absurd result it could not have intended in the first instance, an unusual result, perhaps, of the application of supremacy principles, but a just result.
Issue 6: Did the trial court properly deny Skyreach's motion to convert the jury's lump-sum $137,285 future economic damages award to a stream of periodic payments under RCW 4.56.260 because Skyreach first notified Esparza of its intention to request such relief after the jury returned its verdict?
Skyreach argues that it was entitled to a judgment of periodic payment of the jury's award of $137,285 in future economic damages under RCW 4.56.260, notwithstanding its failure to request periodic payment until after the jury verdict was rendered. Skyreach maintains that the trial court erred by denying its post-verdict motion to convert the jury's award of future economic damages to a stream of periodic payments, and argues that under RCW 4.56.260, the trial court is required to convert a future economic damages award of at least $100,000 to a stream of periodic payments if a party so requests, regardless of when the request is made. That statute provides:
In an action based on fault seeking damages for personal injury or property damage in which a verdict or award for future economic damages of at least one hundred thousand dollars is made, the court or arbitrator shall, at the request of a party, enter a judgment which provides for the periodic payment in whole or in part of the future economic damages.
RCW 4.56.260(1). The statute is silent regarding when a party must submit such a request. Moreover, there are no published Washington cases interpreting this statute and no published statements of legislative intent.
In its memorandum opinion on this issue, the trial court stated that "in order to apply [RCW 4.56.260] fairly it is essential that defendants indicate their early intention to rely upon that law so that plaintiffs have an opportunity to present appropriate economic evidence of the value of future payments and that appropriate jury instructions and verdict forms can be utilized." Clerk's Papers at 536 (citing Green v. Franklin, 190 Cal.App.3d 93, 235 Cal.Rptr. 312, 325-27 (1987); Craven v. Crout, 163 Cal.App.3d 779, 209 Cal.Rptr. 649, 652 (1985)). The trial court then concluded that Skyreach's post-verdict request to convert the jury's lump-sum award of future economic damages to a stream of periodic payments was "too late[.]" Clerk's Papers at 537. We agree.
California has a similar periodic payment statute to ours. The California court noted in Green that in order to convert a jury's lump sum award for future damages to present cash value, the trial court would have to know whether the jury's lump sum award is based on present cash value, or today's gross value without consideration of the effects of future inflation, or today's gross value considering the effects of future inflation. If the trial court were required to formulate a periodic payment schedule when the jury's lump sum award was based on a discounted figure reached by some unknown means, the judgment could in effect be discounted twice. Green, 235 Cal.Rptr.3d at 323. As the Green court observed, "We think it clear that the Legislature never intended such a result when it enacted [California's periodic payment statute]." Id. at 325.
Although the California Court of Appeals refused to hold that "a defendant's request for periodic payment of future damages must occur at the commencement of trial or forever be waived[,]" it stated that "such a request should be made, at the very least, before a *203 plaintiff's economic experts are called to testify." Id. at 325 n. 16. The court explained that such a requirement would impose "no undue burden on the defense and affords both parties the opportunity to submit jury instructions based upon the evidence introduced at trial." Id.
Conversion of future damages to present value and converting present value to gross amounts can involve several judgment calls and determinations of fact. Such judgment calls and determinations of fact should be made by the jury unless the parties can agree to some other means. The parties have a constitutional right to have the jury determine issues of fact. Hrimnak v. Watkins, 38 Cal.App.4th 964, 978-79, 45 Cal. Rptr.2d 514 (1995). In accord: Salgado v. County of Los Angeles, 19 Cal.4th 629, 80 Cal.Rptr.2d 46, 967 P.2d 585 (1998) (holding that the jury must return a verdict for both present and future values and the trial court's periodic payment schedule must match both the present and future values).
In order for the jury to properly perform its task, it must hear evidence regarding the judgment calls and determinations of fact that need to be made. It must also be instructed whether to award any future damages at present cash value or some other value. Here, the jury was generally instructed to consider the elements of future damages, including the reasonable value of necessary medical care, treatment and services with reasonable probability to be required in the future, and the reasonable value of earnings with reasonable probability to be lost in the future. Clerk's Papers at 370.
Each element of future damages accumulates at a different rate, and a single lump sum figure makes it difficult for a trial court to ascertain how much the jury intended to be for future medical care and how much for future earnings, and what duration of payments the jury found to be appropriate for each kind of future damages. A trial court would have no way of knowing the answers to these questions, absent an appropriate special verdict form, so that any attempt to apply a periodic payment schedule would require arbitrary determinations by the court that could result in under-compensation of the plaintiff or overpayment by the defendant. The trial court's ruling was sensible and we affirm it.
Affirmed as to all the challenged rulings except the ruling that Skyreach was prohibited from asking the jury to allocate fault to JLG Industries, Inc., based on product liability for failure to warn of a danger as provided under RCW 7.72.030(1)(c). Skyreach is entitled to a new trial on that issue. Skyreach is not entitled to a new trial on the question of its own liability but only as to the percentage, if any, of the total fault to be allocated to the manufacturer of the manlift.
COLEMAN, J., and GROSSE, J., concur.
NOTES
[1] Although the operator of the manlift, William Espy, was a plaintiff in this action at trial, and initially was a respondent in this appeal, this case now involves only Esparza.
[2] Esparza also urges us to decline to reach this issue because our opinion is merely advisory, in that it can have no practical effect absent a new trial with respect to Skyreach's liability to Esparza. We have elected to reach the issue because we are granting a new trial with respect to whether any portion of the fault for Esparza's injury should be allocated to the manufacturer of the manlift, and we cannot determine from the present record that Weaver is not a potential witness with respect to that issue.